## KLEIN *v.* RUSSELL.

1. Where on a trial for infringement of a reissue of letters-patent—the defence being a want of novelty—a defendant requests the court below to direct the jury to bring in a verdict for the defendant (no objection being then or having during the trial been taken by such defendant, that the reissue was for a different invention from that secured by the original patent), and the request for the direction just stated not having been on that ground, but on the ground of the evidence "relative to the alleged prior use of the process, and the novelty, and usefulness, character, and effect of the alleged invention being so decisive as to entitle the defendant to a verdict"—and the request has been refused—the defendant cannot assign as error the refusal to give the direction, because the reissue was not for the same invention as was the original patent.

2. A reissue is *primâ facie* to be presumed to be for the same invention as is the original patent.

3. A direction to find for one party or the other can only be given where there is no conflict of evidence.

4. Where, on a question of novelty in a patented process, a witness has stated that, after the patent, he was using a particular process which he had been using for twenty years before (a process which the defendant affirmed to be the same as the one patented), it is allowable to ask the witness whether the patentee had not forbid him to use what he was then using; the purpose of the question being to show that the patentee had forbid him, and that the witness then disclaimed using the patented process, and said that he had " a way of his own " which he was using.

5. It is allowable to ask a witness of the opposite side, who has referred to and said that he had seen and copied a paper in reference to the expenses of the suit, subscribed by various persons, what were the contents of the paper; the purpose of the question being to show by the answer that the defendants' witnesses were in a combination to defeat the plaintiff and to share the expense of the opposition. It was not necessary prior to the question to call on any one to produce the original paper.

6. When a patent is on trial and the question in issue involves the matter of novelty, utility, and *modus operandi*, it is proper enough to ask what the effect of the patented invention has been:

7. In construing a patent courts should proceed in a liberal spirit, so as to sustain the patent and the construction claimed by the patentee, if it can

be done consistently with the language which he has employed; and this applies to a reissue as much as to an original patent.

8. Hence when there has been a reissue on an original patent, and the meaning of the specification and claim in the reissue is not perfectly clear, they may be read by the light of the specification and claim of the original patent, and if they can be sustained consistently with the language there used, be sustained by them.

9 A request which asks the court to charge that if a process patented was known to others more than two years *before the plaintiff applied for his patent*, the plaintiff's patent is void—is rightly refused.

10. Where a specification in describing the mode of treating articles with a patented process (a liquid) said that " it is desirable to heat the latter *to or near the boiling-point*," and there was testimony that if *applied* while in that state to the articles to be treated it would greatly injure them, as also that if it was suffered to cool before being applied it possessed virtue, a request which asked the court to charge that the proper construction of the patent is that if the liquid applied at such a temperature is injurious and pernicious, the patent is void for want of utility, is rightly modified by a change which makes the charge say to the jury that the proper construction is that the liquid should be applied at or near the boiling-point under the *common knowledge of persons skilled in the art* of treating the articles to be affected and to procure the desired results, and in reference to the fact whether* such knowledge would make them wait until it was partially cooled before its application; and that if the application of the liquid at such a temperature as is required by the specification, *under this qualification*, was injurious and pernicious, then that the patent was void for want of utility.

11. Where one claim of a patent was for treatment by a compound composed of a liquid and other ingredients mentioned, a request for an instruction that the addition to the liquid of the ingredients is not patentable if such addition does not change the properties of the liquid, or its effect or usefulness, when applied to the *purposes mentioned in the patent*, is rightly modified by charging as requested with the addition of the words " *or to other like purposes.*"

12. A claim for a compound is not void because the specification does not prescribe exact and unvarying proportions in the ingredients of a compound; some of the ingredients being, *ex. gr.*, coloring matter, which the specification says may " be omitted or modified as desired."

13. A court is not bound to comply with requests for charges on points not raised by the evidence; nor when it has charged generally on the subject in its general charge, to repeat itself by answering requests for the same instructions.

ERROR to the Circuit Court for the Northern District of New York; in which court one Russell, a glover, of Glov-

---

* See *infra*, p. 444, note.

ersville, New York, brought suit against Klein, glover in the same place, for an infringement of a patent. The plaintiff got a verdict; the defendant having in the course of the trial taken various exceptions, on which the case was now here.

The case was thus:

In August, 1869, Russell obtained a patent for a new and useful improved process of treating leather so as to render it suitable for the manufacture of gloves. The specification said:

"My invention consists in a novel treatment of what is known as 'bark-tanned lamb or sheep skin,' an article used by book-binders, and which, while sufficiently soft and supple for the purposes of their trade, is too harsh and stiff for glove-making and a variety of other purposes. This objection is removed by my treatment of the article, and the leather rendered so soft and free, yet full in respect of body, as to adapt it, among other purposes or uses, to the making of what are termed 'dogskin gloves.'

"The process I adopt, and which constitutes my invention, is as follows: I take of 'fat liquor' obtained in scouring deerskin after tanning in oil, say ten gallons, and *warm the same by heating to or near the boiling-point.* I then add to such *heated* fat liquor eight ounces of sal soda, twelve ounces of common salt, one pint of soft-soap, and four ounces of Venetian red, and stir and mix these several ingredients with the fat liquor. This forms the treating mixture or compound; and when made in the foregoing quantity will suffice for five or six dozen skins, but of course such quantity may be more or less varied, as may also the proportions of the ingredients; and the Venetian red or other coloring matter is modified or omitted as desired.

"To effect the treatment hereinbefore referred to, of the bark-tanned lamb or sheep skins, I lay said skin on a table or other suitable surface, and *rub the above-described compound* on to both sides of it, using for the purpose a horse or other suitable brush or rubber, by which it can be worked into the skin, that is afterward hung out to dry, and subsequently 'staked,' when the character of the skin will be found entirely changed from harshness to softness, and in other respects, thereby adapting it to the manufacture of gloves of the description previously named,

and to a variety of other purposes for which said skin was not suitable prior to the treatment of it I have herein described."

The claim was thus:

" What is here claimed and desired to be secured by letters-patent is the process *substantially as herein described*, of treating bark-tanned lamb or sheep skin by means of a *compound* composed and applied *essentially as specified.*"

On the 1st of February, 1870, Russell got a reissue of this patent under the thirteenth section of the Patent Act,* which permits a patentee, whenever any patent is "inoperative or invalid by reason of a defective or insufficient description or specification, or by reason of the patentee claiming in his specification as his own invention more than he had a right to claim as new, if the error has arisen by inadvertency, accident, or mistake," to apply for a new patent, and in such case authorizes a new patent to be issued for " *the same invention*," in accordance with the patentee's corrected description and specification.

In the reissue, the invention having been described exactly as in the original patent, the specification said:

" The *principal* feature of the invention consists in the employment of what is known amongst tanners and others as 'fat liquor,' which is ordinarily obtained by scouring deerskins after tanning in oil, but which, when it is not convenient to obtain in this manner, may be produced as a liquor having the same character obtained by the cutting of oil with a suitable alkali.

" In treating leather with the 'fat liquor' it is *desirable* to *heat* the latter *to or near the boiling-point*, and it is *preferred* to use the same in connection with other ingredients. Thus, for instance, there may be added to each ten gallons of such heated fat liquor eight ounces of sal soda, twelve ounces common salt, one pint of soft soap or an equivalent quantity of hard soap, and four ounces of Venetian red, such ingredients to be well stirred and mixed with the fat liquor.

" This forms a good treating mixture or compound, and, when made in the foregoing quantity, will suffice for five or six dozen

---

* 5 Stat. at Large, 122.

skins; but, of course, such quantity may be more or less varied, as may also the proportions of the ingredients, and the Venetian red, or other coloring matter *be modified or omitted as desired.*

" To effect the treatment hereinbefore referred to, of the bark-tanned lamb or sheep skin, the same should be *well dipped in* or saturated with the *fat liquor* OR *compound* of which fat liquor is the base. This may be done by laying the skin to be treated on a table or other suitable surface and rubbing the *fat liquor* OR *compound* on or into both sides of the skin, using for the purpose a horse or other suitable brush or rubber, by which it can be worked into the skin, that is afterward hung out to dry, and subsequently ' staked,' when the character of said skin will be found entirely changed from harshness to softness, and other respects, thereby adapting it to the manufacture of gloves of the description previously named, and to a variety of other purposes for which said skin was not suitable prior to the treatment of it I have herein described."

The claim was thus:

" What is here claimed and desired to be secured by letters-patent is:

" 1. The employment of *fat liquor* in the treatment of leather *substantially as specified.*

" 2. The process, substantially as herein described, of treating bark-tanned lamb or sheep skin by means of a *compound* composed and applied *essentially as specified.*"

Upon *this reissue* Russell sued Klein as an infringer. His allegation was that bark-tanned leather before his treatment of it was harsh, "squeaky," and unsuitable for gloves; but that by his process, which, as he alleged, included *heating* the fat liquor, the "squeak" was removed, and the leather rendered soft, pliable, and suitable for a fine glove; that the treatment costing little greatly enhanced the value of the leather, and furnished a cheaper material for gloves than any other of the same quality and value.

The plaintiff's charge of infringement was wholly confined to the use of his process, including heat; and there was no allegation that the defendant had violated the plaintiff's rights by using fat liquor without heating it.

The defence was want of novelty. The case was heard before the district judge, sitting on the circuit. Numerous witnesses in behalf of the defendant swore that the application of fat liquor to leather, for the purpose of making it soft and pliable, had been known and in more or less use for many years; though they did not swear clearly that the application of fat liquor in a *heated* state with the effects which, in *that* state, it produced had been thus known or in use; and there was no proof by them of any use of fat liquor since the plaintiff's process had been patented otherwise than by heating the ingredients. Nor did they all swear so fully that the application and value of it was known in regard to *bark-tanned* skins; a good deal of their testimony relating to *oil-tanned* skins; and some of it to tanning raw skins or skins imperfectly tanned. Some stated that fat liquor heated near the boiling-point and so applied would ruin the skins.

On the other hand, numerous witnesses of the plaintiff, glovers, at Gloversville, and elsewhere, more or less familiar with the glove business in the vicinity, and during the term of alleged prior knowledge spoken of by the witnesses of the defendant, testified that they had no knowledge of such leather as that which the plaintiff produced till about the date of his patent; that then the kind of leather produced by him with heated fat oils, &c., went into extensive use, and that there was a great demand for it in the market. Some of these witnesses stated that heating the fat liquor to the boiling-point and allowing it to cool so as to make it capable of being worked in, did not destroy its properties. And the testimony of the witnesses of the defendant on cross-examination, tended perhaps to show that their knowledge of the means of softening leather at all by fat oils was very imperfect, and that what product was produced from bark-tanned skins was much inferior to that produced by the plaintiff; and was still affected with "squeak," and could not be used for the better sorts of glove; and that while they had experimented with heated fat oil, they had

never brought any of their ideas to a practical use, and had abandoned them.

In the course of the trial, one *Uriel Case*, a witness of the defendant, having testified as to the manner in which skins were treated twenty years ago, which manner the defendant asserted was substantially like the patented process; and having testified further that he had treated skins in this manner for twenty years until after the issue of the plaintiff's patent, was asked by the plaintiff—

" Did the plaintiff come and forbid you going on ?"

A question to which the defendant objected as immaterial, incompetent, and as calling for the declaration of the plaintiff. But the court allowed the question to be put; the defendant excepting. The witness stated that the plaintiff did not forbid him, but asked him, " Are you not interfering with my patent?" and that he, the witness, " might have told him that he had a way of his own of fixing bark-tanned skins," " that he did not remember having said anything about its being an old thing, or having been done so twenty years ago."

So too, one *Place*, a witness of the defendant, having disclosed on cross-examination the facts, that he was a glover at Gloversville, in partnership with his brother, and that the plaintiff in the present case had sued *him* and his said brother some time before for an infringement of this same patent; that he, the witness, was now present, as his brother also was, without any payment of witness fees, as a witness for the defendant; that his brother had given him a paper in reference to the expenses of this suit ; that he, the witness, had copied it and given it back to his brother, and had not seen it since—was asked by the plaintiff to state the substance of that paper. This was objected to by the defendant: 1st. Upon the ground that the statement of the witness was not the best evidence. 2d. Because no foundation had been laid for the production of the secondary evidence of the contents of the papers in question ; and 3d. Because the testimony would be immaterial and incompetent. But the

court held the question admissible, the defendant excepting. The witness answered:

"It was merely in substance to defend the manufacturing interests against Russell's patent. I didn't know who signed it."

The defendant having given evidence of the use of fat liquor upon oil-tanned skins for many years prior to plaintiff's patent, which use, he asserted, was the same, substantially, as the patented process—and the plaintiff having given evidence that the oil-tanned skins referred to in such testimony, were skins dressed "from the raw" in oil, and that the fat liquor used upon them was a part of, or in aid of, the oil-dressing process—and the plaintiff asserting that the use of the fat liquor in the process of oil tanning, was essentially different from the patented process, that in oil dressing, as it is termed, the fat liquor was used in connection with oil for the purpose of *tanning* the pelt, or, in other words, of *converting it into leather from the raw state,* while in the patented process the fat liquor was applied to a skin *already tanned,* and for the purpose of softening and adding new properties to it—called a witness, one Dr. Porter, who stated that he was a physician and chemist, and had examined the patent of Russell and the specifications, and had made tests and experiments in relation to the fat liquor and the process therein described. The plaintiff then asked him:

"Will you state whether the effect of fat liquor applied to oil-tanned and bark-tanned skins is the same."

The defendant objected to the question "as immaterial, the purpose for which the process is used being immaterial, if the process is the same;" but the court allowed the question to be put. The witness answered "that the general effect was the same, but that the combination by the fat liquor with the different skins produced compounds essentially different."

The record, which set out the substance of the evidence, proceeded:

"The evidence here closed, and the foregoing comprised the

substance of all the evidence given *relative to the alleged prior use of the process mentioned in the patent, and the novelty and usefulness, character and effect, of the alleged invention of plaintiff;* and thereupon the counsel for the defendant insisted before the said judge that the said several matters so produced and given in evidence as aforesaid were sufficient, and ought to be allowed as decisive evidence to entitle the defendant to a verdict, and requested the said judge to direct the said jury to find a verdict for the defendant."

The judge refused so to direct the jury, and proceeded to charge; charging among other things—

"That, taking the reissued patent as the basis of the plaintiff's claim, the true construction of the first claim is the employment of fat liquor generally in the state in which it comes from the mills, in the treatment of leather substantially as described; that this claim covered the employment of fat liquor in its pure and simple state.

"That the second claim covered the compound substantially as described in the specification, and that the heating of the liquor was an essential portion of the patented process under this claim.

"That specifications are not addressed to men entirely ignorant of the manufacture to which the specification relates, but to persons skilled in the art to which it appertains; that if, upon reading this specification, parties skilled in the art of dressing skins would know that this heating was for the purpose of making this compound with the fat liquor or for some other purpose, and that it would not do to apply the fat liquor at or near the boiling-point, because it would destroy the leather, such parties would not be misled by it, and therefore it would not be a fatal defect; but that, if persons skilled in the art, in attempting to put the plaintiff's invention in practice under this specification, would ordinarily apply the liquor to the skins used while it was at or near the boiling-point, and thus destroy them, then, of course, this specification was bad.

"That the jury were to consider the claim of the plaintiff as embracing two distinct and independent things; that the plaintiff had a right, if he was the first and original inventor of the use of fat liquor, in its simple and pure state, in this process, to secure that to himself pure and simple, and to hold, as an in-

fringer, any one who used it without adding the other ingredients that went to make up the compound specified; that he had a right to secure the use of the fat liquor and the other ingredients also, but that the difficulty was, so far as this case was concerned, that the party having embraced within his claim the use of fat liquor in its pure and simple state, the question of heat or of the use of the compound was not very important to the interests of the parties, because, if the party claimed in his patent what was not new, or a substantial or material part of which was not new, the patent was void.

"That, if the jury were satisfied that this process of employing fat liquor in the treatment of leather, as substantially described in the patent, was known, that the process had been perfected, and had been used prior to this time of the plaintiff's invention, and that the persons who used the process had an intelligent comprehension of its character and the effect produced, the patent would be void; and that, upon the question of the validity of the patent, they were to look to the proof in regard to the use of fat liquor, substantially in the manner described when fat liquor alone is used, unconnected with the other ingredients constituting the compound, which is covered by the second claim in the patent; that, if the jury should find that this process had been used prior to plaintiff's alleged invention by other persons, as stated and claimed here, that the persons who used the process were aware of the object and character of it, observed and comprehended the beneficial results produced by its use, then the patent would be void upon the ground of want of novelty, although some circumstances might have induced them to abandon temporarily the actual practice of the invention, or the use of the process.

"That if they came to the conclusion that the process claimed in the first specification, that is the fat liquor had been so used substantially as described in the specification before this invention, that was the end of the case.

"But if they should come to the conclusion, upon the other hand, that all these other experiments were failures and were abandoned, then they would come to the question of infringement.

"That the proof in regard to the quality and character of leather produced and the knowledge of it at Gloversville and vicinity, and the want of knowledge of it, was proper for the

consideration of the jury, in connection with the question of whether these experiments were failures; whether this process was perfected and used; or whether the experiments and trials never reached the point of invention and were consequently abandoned. But it was not a question whether the result of the use of the process was as perfect at the time as it is now. It was a question whether, substantially, the same process was used."

The PLAINTIFF's counsel then requested the judge to charge the jury,

"That the application of heat to the liquor, and the use of liquor, as described, while in a heated state, are essential parts of the invention or discovery; but it is not, by necessary construction, required by the patent that the liquor should be applied to the skins at or near the boiling heat."

The judge declined to thus charge, on the ground that, under the first claim of the patent, neither the heating of the fat liquor nor the application or use of it, in a heated state, was an essential portion of the process.

The DEFENDANT'S counsel then requested the judge to charge,

"1st. That the invention, as described in the patent of February, 1870, is the treatment of bark-tanned sheep and lamb skins by the employment of fat liquor, and if such treatment was known to others, and more than two years before the plaintiff applied for his patent, his patent is void."

Refused.

"2d. That the proper construction of the patent is that the fat liquor should be applied at or near the boiling-point, and if the application of fat liquor at such a temperature to leather is injurious and pernicious the patent is void for want of utility."

Refused in the form put, but modified and given thus:

"The proper construction of the second claim of the patent, so far as it relates to the application of heat, is that the compound composed of fat liquor and the other ingredients required, should be applied at or near the boiling-point, *under the common*

*knowledge of persons skilled in the art of treating this leather*, to procure softness and pliability [?*], would make them wait until it was partially cooled before its application, and if the application of fat liquor at such a temperature to leather as is required by the specification under this qualification is injurious and pernicious the patent is void for want of utility, and the defendant entitled to a verdict."

"3d. That if the patent did not intend that the fat liquor be applied to leather when at or near the boiling-point, it is, in respect to the application of heat, void for ambiguity."

Refused for the reasons substantially appearing in the modification of the last preceding request.

"4th. That if cooling the fat liquor after boiling is an essential point of the plaintiff's process, then the patent is void for not indicating that such process of cooling is necessary or how it is to be accomplished."

Refused in the form put, but modified and given by adding thereto the words:

"Unless the common knowledge of persons skilled in the art of treating this leather to produce softness and pliability would make the operator wait until it was partially cooled before its application."

"5th. That the addition to the fat liquor of the other ingredients mentioned in the specifications is not patentable if such addition does not change the properties of the fat liquor, or its effect or usefulness, when applied to the purposes mentioned in the patent or specification."

Refused in the form put, but thus modified and given:

"The addition to the fat liquor of other ingredients mentioned in the specifications is not of itself patentable, if such addition does not change the properties of the fat liquor or its effect or usefulness, when applied to the purposes mentioned in the patent or specification, *or to other like purposes.*"

"6th. That the process of preparing leather by means of a

* Something was left out here in the transcript. In the syllabus I have assumed that it was the words, "and in reference to the fact whether such knowledge," &c.

compound, as claimed by the plaintiff, is not patentable, because the proportions of such compound are not fixed, but are in all respects indefinite and uncertain, and may be waived or omitted by the terms of the patent."

Refused.

"7th. That if fat liquor had been used substantially in the manner specified in the plaintiff's patent, for the purpose of rendering any kind of leather soft and supple, more than two years [before the plaintiff applied for a patent], the plaintiff cannot recover, even though it had not been so used in dressing bark-tanned lamb or sheep skins."

Refused. The defendant then modified his request, by substituting "used before the plaintiff's invention" for "before the plaintiff applied for a patent," and thereupon the court charged,

"That the application of an old invention or an old machine to produce a new result, because it is applied to a different material, is not an invention, and the question of novelty is to be determined in the same way. That under the first claim of the plaintiff's, if this particular process was used for the purpose of softening leather, it is not material that it was bark-tanned sheep or lamb skins, if it be used as a process for that purpose."

"8th. That if the object of plaintiff's process was to substitute a less valuable article for that commonly known as 'dogskin,' and to impose upon the public by representing gloves made of softened sheep and lamb skins as dogskin gloves, the patent is void for fraud, and plaintiff cannot recover."

Refused, and the jury thus charged:

"If the process patented cannot be made useful for any honest purpose, and can be used only for perpetrating a fraud upon the public, and is therefore not useful, but pernicious, the plaintiff cannot recover."

"9th. That if anything claimed by the plaintiff in his patent, as used, was in fact old, the entire patent was void, and plaintiff could not recover."

Refused, except as had already been charged.

"10th. That the patent could not be sustained in the matter

of the mere degree of heat, if the principle of applying heat to any extent is an old process."

Refused, except as had already been charged.

The jury found for the plaintiff.

On a motion made for a new trial (the circuit judge, Woodruff, J., now sitting), that learned justice was of opinion that there was no sufficient reason for disturbing the verdict. He said:

"The conflict of evidence upon the questions of fact was great, and made it a very proper case for submission to the jury. The impression on my own mind, after a careful examination of the testimony, is that the verdict is right, and the plaintiff is in fact the inventor of a new and useful process secured to him by his patent, and that the defendant is a wilful and deliberate infringer of his rights."

Adverting to the construction of the patent, given by the learned district judge, he observed that it differed from a construction which he had himself put upon it on the trial on the circuit of another case by this same plaintiff, against another defendant, on the same patent (*Russell* v. *Place*), and where he instructed the jury that "the use of heat in the treatment of skins was an essential part of the patented process." The learned justice continued:

"But this instruction was not excepted to by the defendant, and he is not, as a matter of right, entitled to question the correctness of the charge to the jury on that point. In that particular, the question on a motion for a new trial is not simply whether the instruction was correct. If it appeared to me to be erroneous and yet it was clear that it worked no injustice to the defendant, it would be no reason for granting a new trial."

The exceptions to the evidence he considered were not well taken; independently of which the evidence led to nothing. And on the principal questions, the learned circuit judge considering, as already said, that the instructions of the court to the jury were, "at any rate, as favorable to the defendant as he had a right to require, and that the

special instructions sought were charged as fully as the law would allow," denied the motion for a new trial. The case was now here in this position.

*Mr. Matthew Hale, with whom was Mr. J. M. Dudley, for the plaintiff in error:*

I. *The court erred in not directing the jury to find a verdict for the defendant.* 1. The suit was upon the reissued letters. But those letters were void, because they were not granted for the *same invention* as that embodied in the original letters-patent.

2. The original patent had but one claim, substantially the same as the second claim in the reissued patent. This was for the treatment of " bark-tanned lamb and sheep skins" (not leather) with the same compound as in the re-issue. The patentee stated in his original specification that it is " a full, clear, and exact description" of the invention. That " his invention consists in a novel treatment of what is known as ' bark-tanned lamb and sheep skins.' " That " the process" which he adopted and which " constituted his invention was as follows;"—here stating the ingredients of the compound and proportions, substantially as stated in the reissue, and describing only the mode of applying the compound to the skin, of crushing it into the skin, as described in the reissue, closing with the claim stated.

In the comparison it will be seen that the original claimed only the treatment of bark-tanned lamb and sheep skins with the specific compound, brushed or rubbed on, neither describing, suggesting, nor indicating the treatment of leather generally at all, nor such skins with fat liquor alone without said ingredients, nor the saturating by dipping. Upon the face of the two patents the old was for treatment with the *compound* alone, and the reissue is primarily for treatment with *simple fat liquor* alone, stating only that the patentee "*preferred* to use the same in connection with other ingredients;" and, after describing the compound, stating that " this forms a good treating mixture or compound," and closing with the second claim. It is simply for such treat-

ment with simple fat liquor as it comes from the mill (which is in no way indicated in the original), interpolated with the sole treatment and sole claim specified in the original, which is now suggested only as a "preferable" way, and secondary to that of fat liquor alone.

3. Another view exists having the same result.* The original letters were for the use of heated fat liquor, and the reissue for the use of fat liquor generally; there being no doubt that fat liquor generally, or in a cold state, had long been used to soften leather; various additions—ammonia, oil, eggs, &c.—being occasionally, though far from always, made to improve its operation. If this was so, the reissue was equally void. Now, what in the reissue did the patentee claim as his discovery; the use of fat liquor, or the use of heated fat liquor?

(*a*) The invention is alleged to consist in a novel treatment of bark-tanned sheepskins, by which treatment they are rendered soft and free, and suitable to be manufactured into dogskin gloves. This is the result or effect, merely, and gives no light as to the process.

(*b*) The "principal feature of the invention" consists in the employment of fat liquor, obtained from the scouring of deerskins, or manufactured by a process described. The employment of fat liquor, hot or cold, strong or weak, natural or manufactured, is the principal feature. So long as fat liquor in any condition is used, the principal feature is preserved.

(*c*) In treating the leather with the fat liquor, it is "*desirable*" to heat the liquor, and it is "*preferred*" to use the same in connection with other ingredients, to wit, the soda, the salt, and soap, as specified.

The words "desirable" and "preferred" are used to express the same idea, and each is used in contrast with essential or necessary; the meaning is this: "It is desirable to use the liquor heated, that is, the effect will be produced

---

* This view was taken by the Circuit Court for the Northern District of New York in Russell *v*. Dodge.

the more speedily, or with less trouble, or with less expense, but it is not necessary to heat the liquor, and to use the liquor in connection with the other ingredients is the preferable way, but it is not the only way. You may still accomplish the purpose, by using the liquor without the other ingredients and without its being heated."

"This forms," the statement adds, "a good treating mixture or compound." This, again, is an indication of a preference, but not of a necessity—a *good* treating mixture.

And again, "To effect the treatment . . . the skin should be . . . saturated with the fat liquor or compound of which fat liquor is the base." The fat liquor, without reference to its state or condition, or the compound, is here stated as the essential element, and the same expressions are again used in describing the manner in which the liquor shall be applied. It is not required that the liquor shall be heated. After thus describing his process, the patentee sums up his claim under the two heads already stated.

It is the settled rule in this country that the patent and the specification are to be construed together, and that the specification may control the general terms of the patent.* A reference to the claim gives the precise information required of the essentials of the patent, to wit:

1st. "The employment of fat liquor in the treatment of leather substantially as specified," making no distinction between its employment when cold or when heated; and 2d, the process of treating the skins by means of a compound composed essentially as specified.

Now this reissue is, in this respect, quite different from the original patent. In describing his process, the patentee *there* says:

"I take of fat liquor obtained in scouring deerskins, after tanning in oil, say ten gallons, and warm the same by heating it to or near the boiling-point. I then add to such heated fat liquor eight ounces of sal soda," &c.

And his claim is for "the process substantially as herein

* Curtis, § 221.

described, . . . by means of a compound composed and applied essentially as specified." In this description the heating of the fat liquor is not merely " desirable" or to be " preferred," it is an essential element of the process. But this specification the patentee amends by making his claim on the reissue reach the liquor itself, whether cold or hot, and making it reach the liquor whether employed as a compound or alone. He abandons his original claim, except so far as it is redescribed in the reissued patent.

The authorities show that the words "desirable" and " preferred" are not essential parts of the description of the article patented.* The patentee may have intended to take a patent for use of heated fat liquor, but he has failed to express it in his description and specification.

II. *The court erred further in not complying with our requests for instructions.  Let us examine them :*

*1st request.* The court refused to charge that the invention claimed by the plaintiff below, in his reissued patent, was the treatment of bark-tanned sheep and lamb skins by the employment of fat liquor; and that if such treatment was known to others, and more than two years before the plaintiff applied for his patent, his patent was void, and the defendant entitled to a verdict.

The construction of the patent, as indicating only the use of *fat liquor* in dressing leather, whether hot or cold, alone or with other ingredients, as the alleged invention of the patentee, has already been shown to be the true one. Indeed, the patentee having, in surrendering his original patent and procuring the reissue, necessarily sworn that the original patent was *inoperative and invalid* by reason of a defective or insufficient specification, and the original patent having described a compound precisely like that recommended in the reissue, and indicated much more clearly than the reissue, that the application of heat was an essential

---

* Booth *v.* Kennard, 1 Hurlstone & Norman, 527; Stevens *v.* Keating, 2 Webster's Patent Cases, 172; Curtis, § 258.

element in this invention, he is now estopped from asserting that the same identical thing recommended in the specification and second claim of the reissue is valid and operative.* Unless the defendant in error was the *inventor* of the use of *fat liquor* for the purpose indicated, he took nothing by the reissue.

The second branch of the request, that knowledge of this treatment by others more than two years before *plaintiff applied for his patent* rendered the patent void, was also correct.†

The charge of the court had limited the effect of knowledge by others to two years before the *alleged invention*, which was erroneous.

*2d, 3d, and 4th requests.* The court below also erred in refusing these three requests to charge in relation to the construction of the patent, so far as it related to the application of heat, and in modifying the instructions requested as it did.

The patent recommended that the fat liquor be heated "to or near the boiling-point." The natural inference was that it was to be applied in that condition. If applied at such temperature, there was evidence that it would be *destructive* to the leather. But the judge refused to instruct the jury that the patent was void for want of utility, if they believed this evidence, except with a modification, which really left the construction of the specification in the patent to the jury.

We insist (under the third and fourth requests) that the specification in the patent either required the liquor to be applied at or near boiling-heat, or else utterly failed to specify at what heat it should be applied, and that for this reason the patent was void in respect to the application of heat.‡

*5th request.* The court erred in refusing to charge as here requested, with reference to the patentability of the addition to the fat liquor of the other ingredients mentioned in the specifications, and in modifying the request by adding thereto

---

* *Moffitt v. Gaar*, 1 Fisher, 613.

† Act of 1836, § 15; Act of 1839, § 7; 16 Stat. at Large, 208, § 61.

‡ *Tyler v. Boston*, 7 Wallace, 327.

the words " or other like purposes." The "purposes" of the process are clearly set forth in the patent. They were to remove the hardness and stiffness of bark-tanned skins. The evidence was that the other ingredients named in the patent did not change the properties of " fat liquor," which is simply *oil cut with alkali.*

The defendant was entitled to a charge that if the ingredients named when added did not change the properties of fat liquor, or its effect or usefulness, when applied to *the purposes mentioned in the patent or specification,* such addition was not patentable. The words " or other like purposes," added by the court, left the jury to *conjecture* that, for *some other* purpose than making leather soft and pliable, the addition of these ingredients might change the effect of the fat liquor and be patentable.

*6th request.* The court erred in refusing to charge that the process of preparing leather by means of a compound, as claimed by plaintiff, was not patentable, because the proportions were not fixed, but were indefinite and uncertain, and may be waived or omitted by the terms of the patent.

By referring to the specification in the patent, it will be seen that this request should have been complied with. " It is *preferred* to use the same in connection with other ingredients." Then after giving certain proportions, it goes on to say, " but of course such quantity may be more or less varied, as may also the proportions of the ingredients, and the Venetian red or other coloring matter, *be modified or omitted* as desired." In other words, everything was left to the taste and fancy of the user, who was at liberty, under this patent, to use any or all these ingredients in such proportions or manner as he pleased, or to omit them altogether. The description of the pretended " compound" was too vague and uncertain to sustain a patent.*

*7th request.* The court erred in refusing to charge the jury that if fat liquor had been used substantially in the manner

---

* Tyler *v.* Boston, 7 Wallace, 327; Wood *v.* Underhill, 5 Howard, 1; Parker *v.* Stiles, 5 McLean, 54.

specified in the plaintiff's patent, for the purpose of rendering *any kind* of leather soft and supple, more than two years before plaintiff applied for a patent, the plaintiff below could not recover, even though it had not been so used in dressing bark-tanned lamb or sheep skins.

This request was conceded by the learned judge to be correct in principle, so far as it referred to the use of the process for the purpose of softening any leather, but he refused to charge that such prior use for two years before the plaintiff below *applied for his patent* was sufficient.

The fact that the chemical combination of fat liquor with bark-tanned skins may be different from its combination with oil-dressed leather, as asserted by Dr. Porter, does not change the rule, since he states, and all agree, that the general effect is the same upon all skins or leather, namely, to make them soft and pliable.

*9th request.* The court erred in refusing to charge, when requested, that if anything claimed by the plaintiff in his patent as new was, in fact, old, the entire patent was void, and the plaintiff could not recover.

*10th request.* The court below erred in refusing to charge the jury that the patent could not be sustained in the matter of the mere *degree* of heat, if the principle of applying heat to any extent was an old process.

Witnesses had testified that they had used warm fat liquor for the purpose mentioned in the patent, but none testified to having heated it " to or near the boiling-point," as recommended in the specification of the patent. The request was, in effect, that the raising the heat of the fat liquor to the *boiling-point* did not of itself constitute an invention which was the subject of a patent, and the defendant below was entitled to this instruction.*

III. The reasons for our exceptions to evidence appear in the exceptions themselves.

---

* Brooks *v.* Bicknell, 3 McLean, 262; McCormick *v.* Manny, 6 Id. 557; Everson *v.* Ricard, Law's Digest, 181.

*Mr. H. E. Smith, contra :*

I. *The point that the reissue is not for the same invention is not well taken.*

1. It was not made in the court below, and is not, therefore, now available to the plaintiff in error. The general request to direct a verdict for defendant did not call the attention of the court to this point. The Supreme Court will not express an opinion upon a matter of defence not brought to the consideration of the court below.*

2. The original specification did embrace warm fat liquor as the principal thing in his invention; but it was defective in omitting to make the proper claim.

3. Variations from the description in the original specification do not necessarily imply that the reissue is for a new or different invention, for the right to surrender and obtain a new patent is given for the purpose of enabling the patentee to give a more perfect description, and cover what he has invented; and the second necessarily varies from the first.

And the defect entitling the patentee to a reissue may be in the specification or claim, or both.†

4. A reissued patent is presumed to be for the same invention as that included in the original patent. But such inference or presumption in respect to identity is open to be contradicted by proper evidence, which should be submitted to the jury.‡

The argument of the plaintiff in error on his exceptions to the judge's refusal to direct a verdict for the defendant raises the question of—

*The construction of the patent.* But if any error occurred in the construction of the patent in the court below, it was in favor of the plaintiff in error, and he did not except to it or ask a different construction. He cannot now be heard to

---

* Bell *v.* Bruen, 1 Howard, 169.

† O'Reilly *v.* Morse, 15 Howard, 112; Battin *v.* Taggert, 17 Id. 84; Carver *v.* Braintree Manufacturing Co., 2 Story, 439, 440.

‡ Stimpson *v.* Westchester Railroad, 4 Howard, 404; Allen *v.* Blunt, 2 Woodbury & Minot, 139.

complain. Still, as in the litigations under this patent, there has occurred a disagreement among the judges in the Circuit Court, in regard to the construction of the specification in an important particular, and as there are other suits pending which involve the same question, it is desirable to have an authoritative construction, and we consent to argue the question.

Our construction is that the patent covers two things: **1.** A novel treatment of bark-tanned sheep or lamb skins, by heated fat liquor, substantially as described in the specification; and **2,** the treatment of such skins with a heated compound, composed and applied substantially as specified.

The other construction is the one given by the court below and now adopted by the plaintiff in error, that the specification embraces two claims:

**1.** The use of fat liquor, pure and simple, as it comes from the mills, substantially as described in the specification; and—

**2.** The compound substantially as described, and that the heating of the liquor is an essential portion of the process under this claim.

The point of difference is, the *heating* of the fat liquor under the first claim, when it is used without the other ingredients; the patentee asserting that by a fair construction of the patent, it covers only heated fat liquor, while on the other side it is asserted that it covers the use of *cold* fat liquor as it comes from the mills.

The patent should receive the construction given to it by the patentee, for the following, among other reasons:

**1.** If it will bear either construction, it should receive the one most favorable to the patentee; that which will be most likely to protect the invention. The *intention* of the patentee is to be sought in giving construction to the language; and for this purpose particular phrases must not be singled out, but the whole specification and claim must be taken together.* 2. If it appear with reasonable certainty, either

---

* Whitney v. Emmett, Baldwin, 303, 315; Ames v. Howard, 1 Sumner, 482, 485; Page v. Ferry, 1 Fisher, 298, 302.

from the words used or by necessary implication, in what the invention consists, it will be adjudged sufficient, and the rights of the patentee will be protected, however imperfectly or inartificially he may have expressed himself.

In construing the claim it is proper to look at the original patent, and in the original specification it is clear that the patentee intended the use of fat liquor in a *warm* state only.*

Now a reissue must be for the *same invention.* It is not to be presumed that the patentee intended to embrace in the reissue what he had not invented or described in the original, and thus destroy his patent.

The power and duty of granting a new patent for the original invention, upon a surrender of the old, is intrusted to the Commissioner of Patents, and his decision is not re-examinable by the courts, unless it is apparent upon the face of the patent that he has exceeded his authority, or unless there is a clear repugnancy between the old and the new patent, or unless the new has been obtained by fraud or collusion between the commissioner and the patentee. The presumption upon all these points is in favor of the regularity and validity of the reissue.†

By the well-settled rules of construction already referred to in this discussion, the court will not give a construction that will create a repugnancy between the old and the new, and thus invalidate the patent, if the language of the specification and claim, taken together, and in connection with such extraneous facts as may aid in disclosing the intention of the patentee, will admit of another construction.

Independently of all this, the language and structure of the specification require the construction set up by the patentee.

The specification commences by stating in what the invention consists, in these words: "A novel treatment of what is known 'as bark-tanned lamb or sheep skins,' which in

---

* Johnson *v.* Root, 1 Fisher, 351, 355.

† Potter *v* Holland, 4 Blatchford, 238, 242; Battin *v.* Taggert, 17 Howard, 74, 84; O'Reilly *v.* Morse, 15 Id. 62, 112; Hussey *v.* McCormick, 1 Fisher, 509, 515.

the bark-tanned state is too hard and stiff for glove-making, but when subjected to this treatment is rendered suitable for gloves." Stated generally, then, the invention consists of a *novel treatment* of a certain kind of skin, a *process* or *processes;* and the manner and character of this treatment or process is to be thereinafter described.

The specification then proceeds to describe *the novel treatment* or *process* constituting the invention, and begins by saying that the "*principal feature*" of the invention consists of the employment of fat liquor. It does not say that the *whole* invention, or the whole of *any* or *either claim* consists in the mere employment of fat liquor; but that this is a *principal* feature. The expression "*principal* feature" implies that there are other features. It is pertinent to observe also, in view of certain criticisms upon the specification to be noticed hereafter, that fat liquor as the *principal* feature, applies to the compound or *second* claim as well and as fully as to the *first* claim. As, therefore, the fat liquor is to be heated when used in the compound, no inference against its heating when used alone can be legitimately drawn from the statement that the employment of fat liquor constitutes the *principal* feature of the invention. If it intends *heated* fat liquor in one case, as is conceded, it must in the other also.

The specification then goes on to describe further the "novel treatment," and the *other* features of the invention, and says: "In treating leather," that is, the leather beforementioned, "bark-tanned lamb or sheep skins," "with fat liquor, it is desirable to heat the latter to or near the boiling-point, and it is preferred to use the same," *i. e.*, fat liquor *heated*, "in connection with other ingredients." This plainly says, "in treating the leather with *fat liquor*," not with the compound, "it is desirable to heat the latter," *i. e.*, the *fat liquor alone*, "to or near the boiling-point." It will be observed that the heating of the liquor is mentioned before a word is said about other ingredients; and there can be no doubt that the patentee intended the heating of the fat liquor as a part of his process.

In prescribing the compound, the specification says: "There may be added to each ten gallons of such *heated fat liquor*," thus showing clearly that the patentee intended *heated* fat liquor, both when used alone and as the base of the compound.

Afterwards, in speaking of the treatment of the skin, the specification says: "The same should be well dipped in or saturated with the *fat liquor*, or *compound* of which the fat liquor is the base."

While this includes the treatment of the skins with the fat liquor alone, and also with the compound, of which *heated* fat liquor is the base, it does not repeat the word "heated;" hence the omission of the word "heated" when applied to the immersion of skins in the *fat liquor alone*, does not afford a presumption that the patentee did not intend *heated* fat liquor under the first claim. On the contrary, it affords a strong presumption of the reverse.

The construction asked by the patentee is confirmed by reference to the formal claim at the close of the specification. Read in connection with and construed in the light of the whole specification, it is twofold: 1. "The employment of fat liquor in the treatment of leather, *substantially* as specified," that is to say, *heated* and applied to the skin substantially as specified. 2. The process, "substantially as herein described, of treating bark-tanned lamb or sheep skins, by means of a compound composed and applied essentially as specified," that is to say, a *heated* compound composed and applied essentially and substantially as specified.

It is said that the words "*desirable*" and "*preferred*" in the specification are used to express the same idea, and each used in contrast with *essential* or *necessary*. This is a mistake.

The word "*desirable*" applies to the use of the fat liquor, whether alone or in the compound, and refers to the *degree* of heat and not to the *fact of heating*. The patentee does not mean to say that it is not *essential* or *necessary* to heat the fat liquor, but that it is not essential to heat it *up to or near the boiling-point*. The language is not the most apt that might have been employed to express the intention, but reasonably

plain nevertheless. The draughtsman evidently assumed the *fact* of heating, and sought to describe the temperature without limiting it to an exact degree. This view is strengthened by reference to the original specification, where the expression is "*warm the same by heating to or near the boiling-point.*" Here there is no question about the *fact* of heating being essential; and the formula, substantially, was transferred to the reissued specification and there applied to both claims. If, from the language employed, there is no question about the necessity of heating under the old patent, and none when applied to the compound under the new, why should the same language receive a different construction when applied to fat liquor alone?

The word "*preferred*" applies to the compound, and means simply that the inventor prefers it to the use of the heated fat liquor alone, and hence he describes and patents it.

This word may be said to be used in contrast with *essential* or *necessary*, in reference to producing the desired result; that is to say, such result may be produced by the heated fat liquor alone, and that is claimed and patented; but the inventor prefers the compound, and that is claimed and patented also.

II. *As to the requests for instructions.*

1. The first request does not correctly or fully describe the invention. The employment of fat liquor, merely, is not the whole of the invention. It is the employment of fat liquor in the *condition* and *manner* described in the specification. The request erroneously assumes that a knowledge by others of the thing patented, more than two years before *application for the patent*, renders it void. If a prayer for instruction be not correct *in its very terms*, it is not error to refuse it. The charge to the jury covered the ground of this request, and embraced all the defendant below had a right to ask upon the point involved.

2. The second request was properly refused, and the modification was correct. The court had already charged on this point, and the charge and the modification of the re-

quest under consideration, correctly present the law applicable, and were sufficiently favorable to the defendant below. Whether the specification is sufficient, within this rule of law, is a question of fact for the jury; and in the case at bar it was properly submitted to the jury.*

3. The refusal to comply with the third request was correct, for the reasons given in considering the second request, and also on grounds hereafter stated in considering the sixth request.

4. It would have been erroneous to charge as requested by the fourth request without the modification. The question here involved is substantially the same as that spoken of in considering the last two requests, and also hereinafter spoken of in considering the sixth request.

5. In reply to the fifth request, the charge was in accordance with the request except in the addition of the words, "or to other like purposes." If the request without this addition was proper as far as it went, the addition was proper, unless the *mere purpose* or *application* of a contrivance or process is patentable, which will not be asserted. If the addition was *right*, the request without it was *wrong*. The patent was *primâ facie* evidence of utility, and there was no conflicting evidence on this point. Hence, the request involved only an abstract question.

6. The sixth request presents one question only: "Is this claim void for uncertainty, because the specification does not prescribe exact and unvarying proportions in the ingredients of the compound?"

The formula given in the specification gives fixed and certain proportions in the compound, as a general rule. And the specification goes on to say that the proportions of the ingredients may be more or less varied, and the Venetian red or other coloring matter be modified or omitted, as desired. It evidently does not mean that all the ingredients may be omitted; for this part of the specification is treating

---

* Judson v. Moore, 1 Fisher, 544, 547; Davis v. Palmer, 2 Brockenbrough, 298, 308; Wood v. Underhill, 5 Howard, 1, 4; Battin v. Taggert, 17 Id. 74, 85.

of the *compound*, and if all the ingredients were omitted it would be no compound, but fat liquor, simply. The other ingredients may be varied, but the Venetian red or other ingredients may be omitted, if desired. A variety of colors are required in glove leather, and the use or omission of the coloring matter, as well as the kind to be used, would, it is obvious, depend upon the color of the leather desired in a particular case; hence, the impracticability of prescribing in the patent any exact and invariable rule for its use. If the patent fixed the exact and invariable proportions of the other ingredients, it would enable any one to produce the same results, and use the invention with impunity by a slight variation of the proportions, not affecting essentially the character of the compound. In this, as in other respects, the specification is addressed to persons "skilled in the art or science to which the invention appertains." Where the patentee gives a certain proportion as a general rule, which on the face of the specification seems generally applicable, the patent will be valid, though some small differences may be occasionally required.*

7. The seventh request referred to a prior use more than two years before *plaintiff's application for a patent*, and the court properly refused so to charge. The defendant then modified his request, and the court charged substantially as requested.

8. The eighth request is not insisted on in argument. It was purely abstract and speculative. The court was not bound to notice it at all, though it did notice it, and in a way which so far as the defendant is concerned, is unexceptionable.

9. The charge contains just what the ninth request requested. The judge was not bound to repeat himself.

10. The tenth request was to charge "that the patent could not be sustained in the matter of the mere degree of heat, if the principle of applying heat to any extent was an old process." So far as this point involves the question of novelty,

---

* Wood *v.* Underhill, 5 Howard, 1; Ryan *v.* Goodwin, 3 Sumner, 514.

the charge had fully covered the ground, and in accordance with the request. If it was intended by the request to elicit a ruling that a patent could not be sustained for a *mere degree* of heat, then it was, in that particular, abstract and speculative. The specification does not fix any exact degree of heat, and the plaintiff below did not ask to have his patent sustained on that ground.

III. *Exceptions to evidence.*

The question to *Uriel Case* was proper as introductory to the witness's statements at the interview, and as proof of the fact elicited by his further cross-examination, that when charged with an infringement of the patent, he made no pretence of prior knowledge, but claimed " a way of his own," &c., or, in other words, that he did not then infringe.

The question to *Place* was proper also, its object, obviously, having been to show a combination among the defendants' witnesses, including the witness under examination, to defeat the patent and share the expense, thus affecting their credibility.

The objection that it was not the best evidence is untenable. The question was upon a collateral matter arising incidentally in the progress of the trial, affecting merely the credit of the witness.

The witness did not know who signed the paper, and the evidence complained of being, therefore, harmless, error cannot be predicated of its admission.

On the state of the case the question to *Dr. Porter* was proper also, for while it is true that the mere purpose or effect of a process is not patentable, it is equally true that the effect or result produced is always proper to be considered when a patent is on trial. Indeed, it is often most important in determining the questions of novelty and utility. The result, if greatly more beneficial than that produced by old contrivances, reflects back and tends to characterize the importance of the change. Our question to Dr. Porter tended to solve the question raised by the defendant's evidence, whether or not the patented process was or

was not the application of an old principle or process to a new and analogous use. However, Dr. Porter's answer, if it was not harmless in itself, became harmless under the charge of the court in reply to the defendant's request.

Mr. Justice SWAYNE delivered the opinion of the court.

The action was for the infringement of a reissued patent. The plaintiff in error was the defendant in the court below. A verdict and judgment were rendered against him. In the progress of the trial he took numerous exceptions. We have considered them, and will proceed to dispose of the case.

There was no error in the refusal of the court to direct a verdict for the defendant. The evidence is fully set out in the record. It was well remarked by the circuit judge, in deciding the motion for a new trial, that " the conflict of evidence upon the questions of fact is very great, and made it a very proper case for submission to the jury." Where it is entirely clear that the plaintiff cannot recover, it is proper to give such a direction, but not otherwise.

It is insisted, in this connection, that the reissue is void, because it was not for the same invention as the original patent.

This point does not appear to have been taken in the court below, and, therefore, cannot be made here. No instruction was asked or given touching the subject. It is to be presumed, until the contrary is made to appear, that the commissioner did his duty correctly in granting the reissued patent.

The question put to Uriel Case, and his answer, were within the proper limits of a cross-examination.*

The question to Place was proper, and his answer was not objected to. His answer as to his connection with the paper to which he referred also passed without objection. But it is insisted that it was error to require him to state its con-

---

* Johnston v. Jones, 1 Black, 210.

tents, no notice to produce it having been given. To this there are two answers: It was an incidental and collateral matter drawn out to test the temper and credibility of the witness. It in no wise affected the merits of the controversy between the parties. The witness stated that he did not know who signed the paper. The contents could not, therefore, have operated to the injury of the defendant.

The question to Porter involved the novelty, utility, and *modus operandi* of the alleged invention of the plaintiff, and the answer was competent evidence.

Elaborate instructions covering the entire case were given to the jury. None of them were excepted to by the defendant.

Numerous instructions were asked by his counsel. An exception was taken in relation to each one of them, and is assigned for error.

We shall refer to them as they are numbered in the record.

I. That the patent is for "the treatment of bark-tanned sheep and lamb skins, by the employment of fat liquor, and if the jury believe such treatment was known to others more than two years before the plaintiff applied for his patent, his patent is void." This instruction was properly refused. It stated inaccurately the rule of law which it involved. A patent relates back, where the question of novelty is in issue, to the date of the invention, and not to the time of the application for its issue. The jury had already been sufficiently instructed upon the subject. The instruction assumes that the reissue was for the use of fat liquor, without reference to the point whether it were hot or cold. This renders it necessary to construe the patent with a view to the solution of that question.

The original specification declared that the invention consisted "in a novel treatment of bark-tanned lamb or sheep skins." The patentee said: "The process I adopt, and which constitutes my invention, is as follows: I take of 'fat liquor,' obtained in scouring deerskins after tanning in oil, say ten gallons, and warm the same to or near the boiling-point. I then add to such heated fat liquor eight ounces of

sal soda, twelve ounces of common salt, one pint of soft soap, and four ounces of Venetian red, and stir and mix these several ingredients with the fat liquor." The claim is as follows: "What is here claimed, and desired to be secured by letters-patent, is the process substantially as herein described of treating bark-tanned lamb or sheep skins by means of a compound, and applied essentially as specified."

With this specification and claim, it was apprehended that the patent did not cover the use of heated fat liquor *alone*—which the patentee claimed as a part of his invention—but that it would be held to cover the use of such heated liquor only in combination with the ingredients specified. If so, the omission of any one, or all, of the ingredients would have given immunity to an infringer. To remedy this defect the reissue was procured. In the specification in that case the patentee says: "My invention consists in a novel treatment of what is known as bark-tanned lamb or sheep skin."

"The principal feature of my invention consists in the employment of what is known amongst tanners as fat liquor, which is ordinarily obtained by scouring deerskins, after tanning in oil, but which, when it is not convenient to obtain in this manner, may be produced as a liquor having the same character—obtained by the cutting of oil with a suitable alkali. In treating leather with the 'fat liquor,' it is desirable to heat the liquor to or near the boiling-point, and it is preferred to use the same in connection with other ingredients. Thus, for instance, there may be added to each ten gallons of such heated fat liquor, eight ounces sal soda, twelve ounces common salt, one pint of soft soap, or an equivalent quantity of hard soap, four ounces of Venetian red; such ingredients to be well stirred and mixed with the fat liquor."

The claims are as follows:

"1. The employment of fat liquor in the treatment of leather, substantially as specified.

"2. The process, substantially as herein described, of treating bark-tanned lamb or sheep skins by means of a

compound composed and applied essentially as specified."
The mode of application prescribed in both specifications is
the same.

The first claim, it has been argued, is for the use of fat
liquor generally, hot or cold. If it be for the former only,
the patent may be valid; while, if for the latter, it may be
too broad, and, therefore, void.

The counsel for the patentee insists that the claim is lim-
ited to fat liquor in a heated state. The subject is to be ex-
amined in the light of both specifications and of both sets
of claims. The court should proceed in a liberal spirit, so
as to sustain the patent and the construction claimed by the
patentee himself, if this can be done consistently with the
language which he has employed.

The original specification and claim were clearly confined
to heated fat liquor. The law* required that the reissue
should be for the same invention as the original patent. It
is to be presumed the commissioner did his duty. If the
reissue be for fat liquor generally, it is for a thing then
patented for the first time; and the patent involves a viola-
tion of the law.

The second specification says: " The principal feature of
the invention is the employment of 'fat liquor.' " It then
proceeds to direct how the liquor shall be prepared. In
doing this it is said "it is desirable to heat the liquor to or
near the boiling-point."

This is the foundation of the first claim, which is for " the
employment of fat liquor in the treatment of leather, *sub-
stantially as specified.*" The heated condition of the liquor is
before distinctly specified, and if it be applied in any other
state its condition will not be as specified, either exactly or
substantially. After the words "boiling-point," the specifi-
cation proceeds: "And it is preferred to use the same in
connection with other ingredients. Thus, for instance, there
may be added to each ten gallons of such *heated* fat liquor,"
&c. The ingredients are then named. This is the ground

---

* Act of 1836, § 13, 5 Stat. at Large, 122.

of the second claim, to wit: " The process substantially as herein described of treating bark-tanned lamb or sheep skins by means of a compound composed and applied essentially as specified." Here *heated* fat liquor is clearly one of the constituents of the compound. A chemist proved on the trial that heat was an element essential, in a large degree, to the efficacy and utility of both the simple liquor and the compound, when so applied. We think the better opinion is, that the first claim was intended to cover, and does cover, only the use of heated liquor.

The first instruction might well have been refused for the reason, also, that it was too broad as to this point.

II. The next prayer and the action of the court are thus set forth in the bill of exceptions:

" 2. The defendant's counsel also requested the said judge to charge that the proper construction of the patent is that the fat liquor should be applied at or near the boiling-point, and if the jury believe that the application of fat liquor at such a temperature to leather is injurious and pernicious, the patent is void for want of utility, and the defendant entitled to a verdict; but the said judge refused so to charge the jury, but modified the said request and instructed the jury that the proper construction of the second claim of the patent, so far as it relates to the application of heat, is that the compound, composed of fat liquor and the other ingredients required, should be applied at or near the boiling-point, under the common knowledge of persons skilled in the art of treating this leather, to procure softness and pliability, would make them wait until it was partially cooled before its application, and if the jury believe that the application of fat liquor at such a temperature to leather as is required by the specification under this qualification is injurious and pernicious, the patent is void for want of utility, and the defendant entitled to a verdict; and the counsel for defendant then and there duly excepted."

We think this ruling of the court was correct.

III and IV. These exceptions are sufficiently answered by what was said by the Circuit Court as to the second prayer.

V. This instruction was properly modified. The state of the evidence hardly justified the judge in giving any instruction upon the subject to which it related.

The remaining five exceptions may be grouped and disposed of together. Neither of them requires any special remark.

We are satisfied with the rulings of the learned judge who tried the case as to each and all of them.

We find nothing in the record of which the plaintiff in error has a right to complain.

JUDGMENT AFFIRMED.

Dissenting, Justices FIELD and HUNT.