WILLIAMS v. GOODYEAR METALLIC RUBBER SHOE CO.

(Circuit Court of Appeals, Second Circuit. February 7, 1893.)

PATENTS FOR INVENTIONS—NOVELTY—ARCTIC OVERSHOES.
    Letters patent No. 131,201, granted September 10, 1872, to Isaac F. Williams, claimed, "as a new article of manufacture, a cloth and rubber gaiter overshoe, having a double waterproof flap composed of extensions of the vamp and quarter, folded on each side of the vamp or instep, and provided with a buckle and flap tongue, which are arranged to draw equally on each side of the quarter across the instep." *Held,* that this device differed from former manufactures solely in making the water-proof flap or gore integral with the vamp or quarter, instead of a separate piece stitched to them; and, as this change does not involve invention, the patent is invalid.   49 Fed. Rep. 245, affirmed.

Appeal from the Circuit Court of the United States for the District of Connecticut.

In Equity. Suit by Isaac F. Williams against the Goodyear Metallic Rubber Shoe Company to restrain the infringement of a patent. The circuit court dismissed the bill. 49 Fed. Rep. 245. Complainant appeals. Affirmed.

C. E. Mitchell and Mr. Thurston, for appellant.
John K. Beach and Mr. Ingersoll, for appellee.
Before WALLACE and LACOMBE, Circuit Judges.

PER CURIAM. At the close of the argument of this cause, we announced our conclusion that the patent of 1875 was invalid for want of novelty, but reserved our decision as to the validity of the other patent, (No. 131,201, dated September 10,. 1872, granted to Isaac F. Williams,) and as to the other questions presented by the record which would require consideration if the patent should be sustained. We conclude, as to the patent of 1872, that there is no patentable novelty in the subject of the claim. Consequently, the other questions reserved will not need consideration. The claim of the patent is as follows:

"As a new article of manufacture, a cloth and rubber gaiter overshoe, having a double waterproof flap composed of extensions of the vamp and quarter, folded on each side of the instep, and provided with a buckle and flap tongue which are arranged to draw equally on each side of the quarter across the instep, substantially as described."

The patented shoe is an improvement on the well-known "Arctic" overshoe, one of the first examples of which appears in the patent to Thomas C. Wales of 1858. A gaiter overshoe comes well up around and above the ankle. As distinguished from the ordinary, low-cut rubber, the Artic was a cloth and rubber gaiter overshoe constructed very much like the ordinary brogan shoe; the upper, like that of the brogan, being composed of only two portions, called the "vamp" and the "quarter;" the vamp being the forward portion, and the quarter the rear portion, of the shoe. The forward edges of the quarter overlapped the rear edges of the vamp, and at each side of the shoe the quarter had a flap extension, one of which was provided with a buckle, and the other with a tongue, to enable the shoe to be buckled over the instep, and securely

held upon the foot. When buckled, the flaps drew equally on each side of the quarter across the instep. This gaiter was not waterproof above the shoe or foot part, but from the top of the rubber foxing, which begins at a distance of about an inch from the sole, there were interstices through which water could penetrate inside; and while the overlapping of the vamp was sufficient to keep out snow, ordinarily, it did not afford a water-tight construction above the foxing. To make a water-tight connection between the quarter and the vamp, Mr. Williams, the patentee, united together, above the foxing, the vamp and the flap extension of the quarter by a flap or fold, commonly known as a "Bellows Flap." The flap is made of the same material as the vamp and quarter,—waterproof cloth,—and consists of a gore-shaped extension of the vamp, cemented at its exterior edges to the quarter flap; the apex being at the line of the foxing. When the quarter flaps are buckled, the flap folds; one part doubling over the other, and forming a hinge line from the apex upward. When they are loose, it unfolds, and thus readily admits the withdrawal or the insertion of the undershoe. These changes in the organization of the gaiter are the improvements upon the old Arctic which are the subject of the patent.

In view of the cognate use of flaps or folds in undershoes and gaiters as a means of uniting the vamp and quarter to make the gaiter water-tight, there could be no invention in using them for a like purpose in an overshoe, unless something more than the skill of the calling was necessary to adapt them to the new occasion. Mr. Williams made no changes in the Arctic itself. He located the flap at the place in the shoe most obviously adapted for the purpose; and, in making and inserting it, he did not have to encounter any difficulties arising from the nature of the material to be employed, because the rubber cloth could be cut, joined, folded, and manipulated as readily as leather or common cloth. A single reference to the prior state of the art, with which, by legal presumption, Mr. Williams must be deemed to have been familiar, will suffice to show what his departure was.

The Evory & Heston patent describes a gaiter containing a flap for the purpose of making the gaiter water-tight, which is in every respect the double flap of the present patent, except that, instead of being formed, like the latter, of one piece, integral with the vamp, and united at the exterior edges to the quarter, it is made of two pieces of leather stitched together, and stitched at the exterior edges to both the vamp and the quarter. The flap is inserted in each side of the gaiter, and in the same location as the flap of the present patent. The two pieces thus united together, and to the vamp and quarter, form, as the specification states, "a double extension gore upon each side of the shoe, which readily expands to admit the foot, and which may be folded forward over the instep, and be secured by a buckle or suitable lacing, * * * being also water-tight to the extreme top of the shoe." By incorporating this flap, made of rubber cloth, into the old Arctic shoe, locating it at the most obviously appropriate place, and just where it had been located by Evory & Heston, the overshoe would

correspond literally with that specified in the claim of the present patent. It would be a cloth and rubber gaiter overshoe, it would have a double waterproof flap composed of extensions of the vamp and quarter folded on each side of the instep, and it would be provided with a buckle and flap tongue arranged to draw equally on each side of the instep. But, although the flap would be composed of extensions of the vamp and quarter, it would not be made integral with the vamp; and upon this feature of difference is based the argument for the complainant, that Mr. Williams devised a new formation of the vamp of the Arctic shoe, and a new method of folding the same, and of combining it with the quarter. But a mere change in the form of the vamp so as to produce a gore-shaped extension above the foxing line could not require anything beyond the range of the ordinary skill of the calling. The shoemaker would only have to mark off the outlines of the old vamp upon his material, and add the outlines of the Evory & Heston gore, beginning at the foxing line. The exhibit Newark shoe is a demonstration that the insertion of the Evory & Heston flap, made of cloth and rubber, into the old Arctic, at the same point of junction between the vamp and the quarter where it is located in the Evory & Heston shoe, so reorganizes the Arctic as to produce a practically water-tight over-gaiter. The changes made by Mr. Williams did not in the least change the function or essential characteristics of any one of the old parts thus newly assembled together. No one of them performs a new office, or does its appointed work in any better way. The shoe of the patent is a less clumsy and more artistic article than the Newark shoe, and consequently it is not a matter of surprise that it is a commercially successful shoe, which has been popular with those who have wished to wear a completely water-tight shoe.

The observations made by the supreme court when the novelty of the Evory & Heston patent was before that tribunal for consideration, are appropriate to the present patent:

"The changes made in the construction of a water-tight shoe were changes of degree only, and did not involve any new principle. * * * In the construction of it, the vamp, the quarters, and the expansible gore flap were cut, somewhat differently, it is true, from like parts of the shoes constructed under the earlier patents referred to, but they subserve the same purposes. * * * We do not think there is any patentable invention in it, but, on the contrary, that it is merely a carrying forward of the original idea of the earlier patents on the same subject,—simply a change in the form and arrangement of the constituent parts of the shoe, or an improvement in degree only." Burt v. Evory, 10 Sup. Ct. Rep. 394, 133 U. S. 349.

We have not overlooked the testimony bearing upon the commercial success of the patented shoe, or upon the time and effort devoted by Mr. Williams in devising and perfecting his improvement. We are not convinced by it that his shoe supplied a long-felt want, which others before him had appreciated, and attempted in vain to supply, nor that his difficulties in perfecting the shoe were intrinsic ones, inherent in the character of his improvement; and we cannot doubt that if he had taken the Evory & Heston shoe, and placed it by the side of the old Arctic, at the outset of his experiments, he would not have found it difficult either to

transfer physically the flap of the one into the same location in the other, or transfer it by such modifications as he made in the vamp. The decree of the circuit court is affirmed, with costs.