FULLERTON WALNUT GROWERS' ASS'N v. ANDERSON–BARN-
GROVER MFG. CO †

(Circuit Court of Appeals, Ninth Circuit. December 7, 1908.)

No. 1,533.

1. PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — PROCESS OF BLEACHING NUTS.

The Farrell patent No. 663,069, for a process for bleaching nuts, having reference especially to English walnuts, which consists in dipping them in mixed solutions of chlorid of lime and sal-soda, to which at the time of dipping a weak acid is added, for the purpose of liberating free chlorin, was not anticipated, and discloses patentable invention. Nor is it void for lack of sufficient description of the process because it does not specify the proportions in which the two solutions are mixed, it be-

---

ing shown that no particular proportions are essential to the efficiency of the mixture. Also *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

**2. PATENTS (§ 101*)—CLAIMS—SUFFICIENCY OF DESCRIPTION.**

The specification in the claims of a patent for a process of a "weak acid" to be added to a solution does not render the patent void for uncertainty, where the specification names vinegar as a preferable acid, which for practical purposes indicates the standard of strength meant, although it does not limit the claims to the acid so specified, and they are infringed by the use of a dilute mineral acid.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 141; Dec. Dig. § 101.*]

**3. PATENTS (§ 165*) — CONSTRUCTION — PROCEEDINGS IN PATENT OFFICE — ESTOPPEL.**

The claims of a patent which are not ambiguous are to be interpreted according to the meaning of their own terms, and are not controlled or limited by any argument or representation made by the patentee's attorney before the Patent Office as to the scope of the invention or the features in which it differs from the prior art, where no amendment of the claims was required or made.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. § 165.*]

**4. PATENTS (§ 175*) — CONSTRUCTION — INTENTION OF INVENTOR — "COINCIDENTLY."**

A statement in a patent for a process for bleaching nuts that acid is added to the solution "coincidently" with the dipping of the nuts therein should be given a reasonable construction, and does not require that the acid should be added at the very instant of the dipping, but a successive dipping of different crates of nuts after the acid has been added and so long as it remains effective for the purpose used is fairly within the patented process.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 250⅓; Dec. Dig. § 175.*]

**5. PATENTS (§ 322*)—SUITS FOR INFRINGEMENT—REFERENCE FOR ACCOUNTING—MASTER'S REPORT.**

Every reasonable presumption is in favor of a master's report as to the profits made by an infringer of a patent, based on oral testimony, and it is not to be set aside or modified unless there clearly appears to have been error or mistake.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 595; Dec. Dig. § 322.*

Accounting by infringer for profits, see note to Brickill v. City of New York, 50 C. C. A. 8.]

**6. PATENTS (§ 318*)—SUITS FOR INFRINGEMENT—PROFITS RECOVERABLE.**

The advantage which a defendant derived from using complainant's patented invention over what he could derive from any other process or thing which was known prior to that invention constitutes the profits which the complainant is entitled to recover, where the amount can be ascertained with a reasonable degree of certainty.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566, 572; Dec. Dig. § 318.*]

**7. PATENTS (§ 287*)—SUITS FOR INFRINGEMENT—PERSONS LIABLE.**

A corporation whose stockholders were growers of nuts, which received the product of such stockholders, treated and prepared the nuts for market, and sold the same, and after deducting expenses distributed the pro-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ceeds in the form of dividends, is liable for the infringement of a patent for a process which it used in treating such nuts.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 457; Dec. Dig. § 287.*]

Ross, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Southern Division of the Southern District of California.

From a final decree in favor of the appellee against the appellant for $23,-256.10, the profits adjudged to have been realized by the latter from infringing claim 2 of letters patent 663,069, issued to Daniel Farrell on December 4, 1900, covering a process for bleaching nuts, the present appeal is taken. The specifications and claims of the patent are as follows:

"Be it known that I, Daniel Farrell, a citizen of the United States, residing at San Jose, county of Santa Clara, state of California, have invented an improvement in process of bleaching nuts, and I hereby declare the following to be a full, clear, and exact description:

"My invention relates to an improvement in the art of bleaching nuts.

"It consists, essentially, in the preparation of solutions of chlorid of lime and sal-soda, which are mixed, and when employed for work a proportion of the solutions to be used is drawn off into a dipping vessel, and a sufficient proportion of acid is added to liberate the chlorin. The nuts are then immersed in the solution, and are afterwards rinsed in clean water, which is preferably slightly acidulated. Nuts—such as almonds, walnuts, and similar nuts—must present a bright and clean appearance in order to be marketable and of the highest value, and in spite of all precautions the shells of the nuts become discolored and dirty. Various devices have been employed for bleaching or cleansing the nuts. One has been by sprinkling or wetting them, and then placing them in a close room and applying the fumes of sulphur. In some cases the nuts have been rolled in sawdust which is impregnated with a solution of sulphurous acid. The objections to these methods are that the action upon the nuts is not uniform, that any nuts which happened to be slightly open became impregnated with sulphuric acid, and, further, the nuts subjected to this treatment are apt to become rancid within two or three months, and will not keep properly.

"In my process I use chlorid of lime and sal-soda. The chlorid of lime and the sal-soda are dissolved separately and afterwards mixed together, and the solution is then allowed to settle until the thick, white lime is at the bottom. The clear solution is then drawn off, and is in readiness for use. This combination of the two solutions appears to retain its effective bleaching qualities for a much longer time than the separate chlorin solution, and it is very much more effective in its results. No white deposit is left upon the nuts, and after bleaching is completed they show no trace whatever of the solution.

"When the work is to be done, a sufficient proportion of the combined solution is drawn into a dipping vessel of suitable capacity, and an amount of acid is added, which will liberate the chlorin gas.

"I have found that, while many acids might produce the result of liberating the gas, a safe acid for the purpose is acetic acid or vinegar, and of which I may use approximately 1 part to 20 of the solution. The nuts are then immersed coincidently with the addition of the acid, and thoroughly wetted with the solution, and the escaping chlorin gas will bleach them. After having been immersed for a sufficient length of time, the nuts are taken out and then rinsed in clean water, to which is preferably added a little vinegar to acidulate it, so that any of the alkali which may remain upon the surface of the nuts will unite with the acid and leave them in a clear condition. When thus treated and dried out, no trace of the solution can be found upon the surface of the nuts, which are brightened and cleaned to a surprising degree.

"Having thus described my invention, what I claim as new, and desire to secure by letters patent, is:

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"(1) In the art of cleansing and bleaching nuts, the steps consisting in mixing a compound solution of chlorid of lime and sal-soda in a dipping vessel, adding a weak acid thereto, and immediately plunging the nuts into the solution and removing them, and finally washing them.

"(2) In the art of washing and bleaching nuts, the steps, consisting in mixing a compound solution of chlorid of lime and sal-soda in a dipping vessel, adding a weak acid thereto, whereby potentially effective chlorin is liberated, and plunging the nuts in an openwork basket into the solution, and immediately removing them."

John S. Chapman and Ward Chapman, for appellant.
John H. Miller and Wm. K. White, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The invention covered by the patent relates to the preparation of English walnuts for the market by bleaching their shells. The principal sources of these walnuts are Southern California and Southern France. From the evidence it appears that the French nuts are naturally clear and bright in appearance and require no bleaching, while a portion of the California product is discolored by black splotches, caused by rains, dews, fogs, sunburn, bacteria, or other causes, and unless bleached is unsalable, or can only be sold at a largely reduced price. Prior to the invention of the Farrell process, there was but one process used in California for bleaching the nuts, and that was the sulphur process. One method of this process was to place the nuts on superimposed trays, stacked in a dryhouse, and burn sulphur on the floor beneath them. Another method was to place the nuts in sawdust impregnated with sulphuric acid. Both methods were unsatisfactory. In the first, heat generated by the burning sulphur caused the nuts to expand and open, thus permitting the sulphur fumes to affect injuriously the kernels. In the second, the sulphuric acid at times penetrated the seams of the shells and injured the kernels. In addition to this, the bleaching by either method was not uniform. Daniel Farrell, the patentee, a walnut grower and an amateur chemist, made various experiments to discover a better process, and as the result thereof discovered one which proved highly satisfactory and successful, and went into almost instantaneous and universal use, and for which he obtained the letters patent.

The appellant earnestly contends that the process covered by the patent is devoid of any originality or invention, and that it was anticipated by prior patents, by prior printed publications, and by prior use. Considering first the prior patents and publications, we find that the first so relied upon is that of George Lunge, of date September 8, 1885, for an invention involving "the application of chlorid of lime for bleaching and other purposes." It relates wholly to the bleaching of textile fabrics, and consists primarily in the use of chlorid of lime and acetic acid. The specifications state that hydrochloric, sulphuric, or oxalic acid, when used with chlorid of lime, causes the evolution of free chlorin, "which acts too strongly upon the fabric, and is injurious both to the health of the workmen and the machin-

ery." For this reason and others, the inventor uses acetic acid in connection with the chlorid of lime. His claim reads as follows:

"Increasing and hastening the action of chlorid of lime and saving the usual operation of souring after the bleaching without injuring the fiber in any way by the action of acetic or formic acid, as described."

Clearly this is a process fundamentally different from that of the Farrell patent. In the reaction which occurs under the Lunge process no free chlorin is evolved. In that fact is to be found, in the opinion of the inventor, the principal value of the process, for he points out in his specification the well-known fact that, in bleaching textile fabrics, free chlorin is destructive of the fiber. In the Farrell process, on the other hand, the nascent chlorin which is evolved is the active agent which accomplishes almost instantaneously the desired bleaching. In addition to this, the Lunge process dispenses with one of the ingredients used by Farrell, and one essential to the reaction which his process involves, namely, sal-soda.

Reliance is especially placed upon Ironmonger's patent of date May 7, 1872, an invention relating to the cleaning and bleaching of the shells of peanuts. In that patent the process calls for the use of 100 gallons of water, in which are added 50 pounds of chlorid of lime and 12½ pounds of sulphuric acid. In this solution the peanuts are to remain one hour, more or less, until they are sufficiently whitened. Then they are to be washed in clear water to remove the chlorin. It is obvious that the first step in the process has nothing to do with the bleaching further than to remove the dirt from the nuts. The bleaching process consists in the use of chlorid of lime and sulphuric acid in solution with water. The reaction which occurs is as follows:

"The acid unites with the calcium to form calcium sulphate. The hydrogen in the acid unites with the oxygen to form water, and the chlorin is released."

A wholly different reaction takes place in the Farrell process. The acid is not added until after a reaction has taken place between the sal-soda and the chlorid of lime, whereby sodium chlorid and sodium hypochlorite have been produced. It is upon these products that the acid acts to release chlorin. The Ironmonger process, if applied to walnuts, would result in the deposit of calcium sulphate on the shells, involving further treatment for its removal, and would require an hour, more or less, for the bleaching operation, whereas in the Farrell process from 7 to 10 seconds is all that is required.

It is unnecessary to discuss in detail all the other patents relied upon by the appellant. The Haserick patent of July 23, 1872, for an improvement in bleaching wool, woolen yarns, and fabrics, covers a process in which the essential bleaching element is sulphurous acid, and in which chlorin or chlorid of lime is wholly dispensed with. The Spencer patent of date November 29, 1887, for a process for cleaning nuts, beans, and like articles, consists of the mechanical process of using a quantity of damp sawdust to which has been added sulphuric acid, and it is not a bleaching process in any sense of the term.

But it is said that the process described in the appellee's patent is a bleaching process which has been known and used for many years,

and is essentially the same as that which is described in the United States Dispensatory, p. 824, by use of the solution known as the "Labarraque solution," which is an aqueous solution with several chlorin compounds of sodium formerly used for bleaching textile fabrics. The solution is composed of chlorinated soda, and is formed by combining triturated chlorinated lime with a solution of sodium carbonate, in a manner described. The textile fabric was first soaked in the combined solution. Then it was removed therefrom, and dipped in an acid solution which acted upon the chemicals carried in the fiber and produced hypochlorous acid, which bleached the fiber, care being taken to avoid the release of free chlorin which would injure the fiber. In the feature last noted the process differs materially from that of Farrell, which depends wholly upon free chlorin as its bleaching agents.

It is further claimed that the appellee's process is anticipated by a formula which was promulgated by Prof. E. W. Hilgard, of the Agricultural Department of the University of California, about a year before the date of the Farrell invention. Certain walnut growers of Southern California, discouraged at the failure of the sulphur process to bleach their product, applied to Prof. Hilgard for assistance in their dilemma. In answer to their application he and his associates conducted a series of experiments, and, as the result thereof, published a process which it was suggested would be an improvement upon the sulphuring process then in use. It was recommended that a bleaching dip be used, in which the nuts were to be immersed for a definite time, that the bleaching agents cheapest and most readily procured were bleaching powder (also called chlorid of lime) and bisulphite of lime, that experiments indicated that the corresponding soda compounds act more rapidly and satisfactorily, that the soda-chlorin compound is obtainable by mixing bleaching powder with sal-soda, that the chlorid of lime or soda when used alone is objectionable in that it softens the shells and turns them to an undesirable color—but this it was suggested could be prevented by following up with a dip in the bisulphite or by light sulphuring—and that very satisfactory results had been obtained by placing the nuts in a cane or splint basket and dipping them in a solution of bleaching powder and sal-soda, after which they were removed, rinsed with a hose, and then dipped into another solution containing a small percentage of bisulphite of lime, and then finally rinsed with water, or, instead of the second dipping, the nuts were sulphured 10 or 15 minutes. It is unnecessary to consider this process further than to say that it is radically different from that of the appellee. It makes no suggestion of the use of an acid to release chlorin, and it is not different in its essentials from the process of bleaching textile fabrics that had long been in use. The evidence, moreover, indicates that the process proved a failure and was abandoned.

Upon a careful consideration of the record, we are convinced that the appellee's process is not void for want of invention. When the solutions of chlorid of lime and carbonate of soda are mixed together in a common vessel, reactions take place which result in the formation of a compound solution of sodium hypochlorite and sodium chlorid. It is into this solution that the acetic or other weak acid

is added. A reaction then takes place, which results in the release of nascent chlorin. It is the well-known law of gases that their power is greatest when they are nascent, and that the greatest affinity of chlorin is for hydrogen, with which it unites to form hydrochloric acid. The coloring matter adhering to the shells is of course of vegetable origin, being composed of organic matter, the elements of which are carbon, hydrogen, and oxygen. The union of the chlorin with the hydrogen breaks up the organic matter and leaves the carbon and the oxygen free to unite and form carbonic acid. It is not in the use of chlorid of lime or carbonate of soda or of a weak acid, or of all of these combined, that the appellee's invention consists. It is in so employing these ingredients that in the final reaction chlorin gas is freely liberated in a nascent state so as almost instantly to destroy the organic matter which stains the walnut shells, and this particular combination and reaction may be sought in vain in any of the prior patents and processes known, published, or used before the date of the invention. In brief, the inventor discovered a new process of utilizing well-known laws in the production of a new and useful result.

It is contended that the patent is void for the reason that it does not contain a description of the process, nor of the manner of using it in such full, clear, concise, and exact terms as to enable a person skilled in the art to compound and use it, in that the proportions of the ingredients of the compound are not specified, nor is any method suggested for arriving at their proper proportions in use. It is true that the specifications do not specify the proportions of the sal-soda and the chlorid of lime solutions. A fair interpretation of the specifications, we think, would be that they call for a compound solution composed of equal proportions of saturated solutions of chlorid of lime and sal-soda. But the evidence is that it is not essential to the operation of the process that the proportions be equal, and that the bleaching is as well effected if either of the ingredients largely exceeds the other. The inventor was not required to specify how the process could be most economically used. It was enough if he so described it that one skilled in the art could use it. It may be conceded that clearer information would have been afforded if the precise proportions of each solution had been indicated, but we are not prepared to say that for want of such precise information the patent should be held void. A patent for a process is not to be held to the strictness of specification required in a patent for a composition, and the decisions holding void applications for patents of the latter class are not necessarily applicable to process patents. We think that one skilled in the art of bleaching could, from the terms of the specification, without further information, make a compound solution such as would render the process practicable. The specification is not, we think, more indefinite or uncertain than those which were sustained in Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279, and Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968. In the first of these cases, Mr. Justice Bradley said:

"The mixing of certain substances together, or the heating of a substance to a certain temperature, is a process. If the mode of doing it, or the ap-

paratus in or by which it may be done, is sufficiently obvious to suggest itself to a person skilled in the particular art, it is enough, in the patent, to point out the process to be performed, without giving the supererogatory directions as to the apparatus or method to be employed."

In the second case, Mr. Justice Brown said:

"The specification of the patent is not addressed to lawyers, or even to the public generally, but to the manufacturers of steel, and any description which is sufficient to apprise them in the language of the art of the definite feature of the invention, and to serve as a warning to others of what the patent claims as a monopoly, is sufficiently definite to sustain the patent."

When we come to the acid which releases the bleaching agent, we find that the necessary information as to proportion is afforded in the specification. It is 1 part of weak acid to 20 parts of the solution. But it is said that the term "weak acid" is indefinite, and that the appellant, which used diluted sulphuric acid, was not precluded from such use, since sulphuric acid is not a weak acid, and no standard of acidity is fixed by the term "weak acid." But by specifically referring to the use of vinegar, the patentee has made known the standard of acidity of the acid which will operate successfully with the solution. He declares in his specifications that he has found that, while many acids might produce the result of liberating the gas, a safe acid for the purpose is acetic acid or vinegar. In his claim he confines himself to no specific acid. The appellant has found that by the use of diluted sulphuric acid the bleaching process can be as effectually accomplished as by the use of vinegar. But it does not thereby avoid infringement. It uses a weak acid within the terms of the claims. By no fair construction of the language of the specifications can it be said that the patentee disclaimed the use of sulphuric acid. The reference therein to the injurious effect upon nuts from the use of sulphuric acid relates wholly to the prior processes of bleaching nuts. He testified that he had experimented with sulphuric acid, nitric acid, and muriatic acid, but that he preferred acetic acid on account of its harmlessness, not in the process itself, but in the incidental handling and use thereof. Obviously he was not required to experiment with all kinds of acids, and to state in his specifications what acids would and what would not be suitable for the purpose, and we think it does not extend the patent beyond its proper scope to say that it covers the use of any acid which, by chemical reaction, will release the chlorin in the bleaching solution. A strong acid would cause a violent and sudden evolution of chlorin, which would almost instantaneously be dissipated. A weak acid releases the chlorin gradually and continuously. There doubtless are acids known to chemistry which will not accomplish the reaction incident to the release of the chlorin, but the acids commonly known, such as acetic, sulphuric, muriatic, oxalic, and nitric acids, when diluted to the acidity of vinegar, may, it is shown, be successfully used in the process. In Rubber Company v. Goodyear, 9 Wall. 795, 19 L. Ed. 566, it was said:

"Patent should be construed in a liberal spirit, to sustain the just claims of the inventor. This principle is not to be carried so far as to exclude what is in it, or to interpolate anything which it does not contain. But liberality, rather than strictness, should prevail where the fate of the patent is involved,

and the question to be decided is whether or not the inventor shall hold or lose the fruits of his genius and his labors."

, And in Klein v. Russell, 19 Wall. 466, 22 L. Ed. 116, it was said:

"The court should proceed in a liberal spirit so as to sustain the patent and the construction claimed by the patentee himself, if this can be done consistently with the language he has employed."

Applying these settled rules of construction to the claims of the patent here in question, we find in the record sufficient to sustain the invention of the patentee, and the infringement thereof as found by the trial court.

It is earnestly contended that by virtue of the proceedings in the Patent Office upon the application for the patent, and by the admissions therein made by the attorney for the patentee, the appellee's invention, if it be an invention, is limited to the coincident immersion of the nuts with the addition of the weak acid to the bleaching solution. It appears from the file wrapper that the patent was at first rejected by the examiner for want of invention, and that, in the argument which ensued, the attorney for the applicant insistently pointed to the fact that the applicant's invention differed from all prior bleaching processes in that the nuts are plunged into the bleaching solution at the very instant of adding a weak acid thereto, and again the attorney made the same contention on appeal to the examiners in chief, who also rejected the application. But it appears that on appeal to the Commissioner the ruling of the examiners in chief was reversed, and the patent was allowed as to both claims. The question arises whether those claims are to be limited in their scope by the arguments or admissions made by the patentee's attorney in the proceedings in the Patent Office. It is true that where an applicant presents to the Patent Office a claim, which is rejected as being anticipated by prior patents or publications, and in consequence thereof he amends his claim so as to avoid such anticipation, he may not thereafter contend that the claims are to receive the construction to which they would have been entitled if such limitation or restriction had not been inserted. But in the present case there was no amendment or restriction of the claims. They were allowed in the terms in which they were originally formulated. Said the court in Goodyear Dental Vulcanite Co. v. Davis, 102 U. S. 222, 227, 26 L. Ed. 149:

"We do not mean to be understood as asserting that any correspondence between the applicant for a patent and the Commissioner of Patents can be allowed to enlarge, diminish, or vary the language of a patent afterwards issued. Undoubtedly a patent, like any other written instrument, is to be interpreted by its own terms."

And in Westinghouse v. Boyden Power Brake Co., 170 U. S. 582, 18 Sup. Ct. 728, 42 L. Ed. 1136, the court, after alluding to the fact that in case of ambiguity it may be allowable to consult the application and file wrapper, "and possibly written communications which may throw light upon claims that are ambiguous or capable of different constructions," said:

"But where the claims allowed are not uncertain or ambiguous, the courts should be slow to permit their construction of the patent actually granted and

delivered to be affected or controlled by alleged interlocutions between the of-' ficers in the Patent Office and the claimant."

So in Palmer Pneumatic Tire Co. v. Lozier (C. C.) 84 Fed. 659, 665, Judge Lurton said:

"There is no estoppel growing out of the opinion entertained by the Patent Office as to the legal effect of the language employed by applicants, either in their specification, or claims, nor as to the scope and meaning of earlier patents. It is undoubtedly the duty of the Patent Office to allow or disallow applications as it may deem the matter patentable or not, and for this purpose to inquire into the state of the art and compare with patents supposed to interfere. But we are not aware that the conclusions of the Patent Office operate as an estoppel upon the patentees, except in cases where the applicant is required to abandon some part of his claim or accept alterations narrowing their scope. Neither are the courts any more concluded by a construction of the claim presented by a patentee which removes a supposed conflict with an existing patent than they would be by an interpretation of a patent whereby it was distinguished from the old art. That some claim has been rejected, or that some amendment has been accepted which was imposed as a condition to the allowance of a claim, is essential to an estoppel on a patentee."

In the light of these authorities, it is clear that the claims of the patent, unambiguous as they are, are to be interpreted according to the meaning of their own terms, and are not to be controlled or limited by any argument or representation made in the Patent Office by the applicant's attorney as to the scope of the invention or the features wherein it differs from the prior art. The force of these considerations becomes apparent when it is considered that in the actual operation of the appellee's invention it is not practicable to plunge the nuts into the bleaching solution at the very instant of the addition of the acid. Even if the protection of the patent is to be limited to coincident immersion, the term should receive a reasonable interpretation, and should be held to mean an immersion of the nuts in the bleaching solution practically at the time when the acid is added, and while it continues to accomplish the result of releasing the nascent chlorin. It is shown in the evidence that acetic acid accomplishes that result for a period of 20 minutes, during which time, in the practical operation of the process, crates of nuts are consecutively dipped and allowed to remain for the space of a few seconds. Any immersion of the nuts during the space of time during which that reaction is taking place, it is reasonable to say, is an immersion coincident with the addition of the acid.

It is contended that, conceding the validity of the patent and the infringement thereof by the appellant, there was a total failure of proof of profits realized by the latter from the use of the process, and that the decree should have awarded nominal damages only. The accounting was had before a special master. Voluminous testimony was taken. It was shown that at first the appellant used the patented process under a license and paid a royalty therefor, but that during the years 1901, 1902, 1903, and 1904 it deliberately used it without license until enjoined by a decree of the court. The findings of the master upon the evidence are, in brief, that at the beginning of the annual nut harvest the nuts are generally bright, but toward the latter part of the season their shells are so darkened and blackened by rains and from other causes as to be unsalable; that prior to the date of the

invention there was but one method of bleaching nuts, and that was the sulphur process; that there are certain classes of nuts which this process will not bleach at all, nuts damaged by rains, disease, or other causes so as to become spotted; that the proportion of such nuts is at least 10 per cent. of the total crop; that the patented process will successfully treat them, and convert them into first-class nuts; that if they are treated by the sulphur process they will be classed as culls, and will bring in the market but 3½ cents a pound; that by the patented process the nuts handled by the appellant were brought into the market as first-class nuts; that the difference between what they actually brought as first-class nuts and what they would have brought if they had been sold as culls constituted the savings or profits to the appellant from the use of the patented process; and that the books and records of the appellant showed the quantity of nuts actually handled during the time of the infringement, and the actual cost of treating and handling the same. Every reasonable presumption is in favor of a master's report based on oral testimony, and it is not to be set aside or modified unless there clearly appears to have been error or mistake. Tilghman v. Proctor, 125 U. S. 136, 149, 8 Sup. Ct. 894, 31 L. Ed. 664; Callaghan v. Myers, 128 U. S. 666, 9 Sup. Ct. 177, 32 L. Ed. 547; Camden v. Stuart, 144 U. S. 118, 12 Sup. Ct. 585, 36 L. Ed. 363. In Walker on Patents, § 725, it is said:

"The advantage which the defendant derived from using the complainant's invention, over what he could derive from using any other process or thing which was known prior to that invention, constitutes the profits which the complainant is entitled to recover."

Of course, it cannot be ascertained with absolute certainty what was the exact sum total of the profits realized by the appellant from the use of the patented process. The evidence fully sustains the reasonableness of the conclusion of the master that at least 10 per cent. of the appellant's crop must necessarily have been sold as culls but for the use of the appellee's invention. The total amount of the appellant's crop during the years of infringement was definitely shown by its own books. The market prices during those years were ascertained. Here were definite figures upon which to calculate the profits. The law requires no more than a reasonable degree of certainty in such a case. Suffolk Co. v. Hayden, 3 Wall. 315, 320, 18 L. Ed. 76; Doten v. City of Boston, 138 Fed. 406, 70 C. C. A. 308; Bigelow Carpet Co. v. Dobson (C. C.) 10 Fed. 386.

But it is said that if any profits were realized they accrued to the walnut growers who composed the Fullerton Walnut Growers' Association, the appellant herein; that the appellant owns no walnut trees, and acquires no nuts of its own, but that it received from the stockholders of the association the nuts which they produce, prepares them for the market, ships them, collects the proceeds, deducts the expense, and turns over the profits to the growers. This argument suggests a point which was not raised in the court below, and which is not specifically embraced in any assignment of error. The record shows that the appellant is a corporation. Individual growers of nuts are its stockholders. They turn in their nuts to the corporation to be treated and sold. The nuts are all put into one common stock. The appel-

lant treats the nuts by the patented process, then sells them in the market through brokers. Out of the proceeds it deducts the cost of treatment and of sale, and then distributes among the stockholders the net proceeds in the form of dividends. Until a dividend is declared and the profits are distributed, they belong to and are the property of the corporation. The corporation was the infringer. We see no reason for holding that the appellant should not be held liable as would any other corporation be held for the profits so realized. It may be, as suggested in the briefs, that the appellant possesses no property out of which the judgment may be satisfied, but that is not ground for holding that it is not in law liable to the appellee.

The decree is affirmed.

ROSS, Circuit Judge (dissenting). Among the defenses set up by the answer of the defendant to the suit were lack of novelty and invention, anticipation, no infringement, and a want of sufficient description of the alleged invention. By the decree appealed from it was adjudged that claim 2 of the patent was valid, and that it had been infringed by the defendant.

The invention claimed was for an improvement in the art of bleaching nuts, and was in no sense one of a pioneer character.

I agree that in considering the sufficiency of the description contained in the specification, as well as the claims, a liberal commonsense construction should be given so as to sustain the patent, if this can be done consistently with the language employed therein. Davis v. Palmer, 7 Fed. Cas. 155; Davoll v. Brown, 7 Fed. Cas. 199; Turrill v. Railroad Co., 1 Wall. 491, 17 L. Ed 668; Rubber Co. v. Goodyear, 9 Wall. 788, 19 L. Ed. 566; Klein v. Russell, 19 Wall. 443, 22 L. Ed. 116; Cornplanter Patent, 23 Wall. 181, 23 L. Ed. 161; Merrill v. Yeomans, 94 U. S. 568, 24 L. Ed. 235.

At the same time the same common-sense view must be taken of the statute by virtue of which patents are issued, which involves, of course, a consideration of the purpose of the required specification. The pertinent statutory provisions are as follows:

Revised Statutes:

"Sec. 4886. Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement thereof, not known or used by others in this country, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, and not in public use or on sale for more than two years prior to his application, unless the same is proved to have been abandoned. may, upon payment of the fees required by law, and other due proceedings had, obtain a patent therefor." U. S. Comp. St. 1901, p. 3382.

"Sec. 4888. Before any inventor or discoverer shall receive a patent for his invention or discovery, he shall make application therefor, in writing, to the Commissioner of Patents, and shall file in the Patent Office a written description of the same, and of the manner and process of making, constructing, compounding and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it pertains, or with which it is most clearly connected. to make, construct, compound and use the same, and in case of a machine, he shall explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions; and he shall particularly point out and

distinctly claim the part, improvement, or combination which he claims as his invention or discovery. The specification and claim shall be signed by the inventor and attested by two witnesses." U. S. Comp. St. 1901, p. 3383.

The conceded purpose of the statutory requirement in process cases· is that the specification must be in such full, clear, and exact terms as to enable any one skilled in the art to which it pertains to compound and use the process without any experiments of his own. The first question for consideration, therefore, is, does the specification of the patent in question answer that requirement?

The evidence in the case undoubtedly shows that the patentee's process bleaches nuts better, more expeditiously, and with less damage than any theretofore known; yet it is just as true that, if there was anything new in his mixture of chlorid of lime and sal-soda, it must necessarily have been in the proportions; for years before the patent in question was applied for, solutions of chlorid of lime and of sal-soda, as well as a mixture of such solutions, were well-known bleaching agents. This was not only clearly shown in the evidence introduced in the present case, but was also clearly made to appear in the proceedings in the Patent Office for the patent in question. Neither the specification nor the claims make any mention of the proportions of chlorid of lime or sal-soda to be used, but the witness Anderson, who, it appears, secured the assignment of the claimed invention from Farrell to the Anderson Prune Dipper Company, testified that he explained to those desiring to use the process the proper proportions—his testimony being, in part, as follows:

"A. Yes, I visited the Fullerton Walnut Growers' Association. Q. Yes? Now, what dealings did you have with them? A. At first they were not interested, but later in the season I made an arrangement with them whereby they were to use the process on any quantity of nuts that they wished to for a certain royalty per car. This arrangement was to stand for that season. Q. What season was that? A. 1898. Q. Then it was for only that one season? A. Only that one season. Q. And did they use it during that season? A. On a limited number. I understood—was told by the manager—that they used it on their difficult nuts. Q. What do you mean by the 'difficult' nuts? A. Well, I presume those that they could not get in merchantable shape with the sulphur process. Q. You don't know the extent to which they used it that year, though, do you? A. From three to four cars is my recollection. Q. Were they to pay for that use? A. Yes, sir. Q. They agreed to pay for that use, did they? A. They agreed to pay it. Q. And that agreement related to only that one season, did it? A. Yes, sir. Q. Now, did they ever use it after that season? A. They used it in the season of 1900–01. I could not state from personal knowledge that they used it in 1902. Q. But they used it in 1900 and 1901, to your knowledge, did they? A. I was there and saw them using it in 1900 and 1901. Q. What was the occasion of your being there? A. I had business in those parts of the state with other associations. Q. And you visited those places in 1901, and saw them using that process? A. Yes, sir. Q. Describe the process as they were using it. A. I could not say definitely the proportions in which they used it, but I could state they used a compound solution of chlorid of lime and sal-soda and an acid to liberate the petroleum (chlorin). Q. Had you given them full instructions in 1898 as to how to use it? A. Yes, sir. Q. You had furnished them with a formula, had you? A. I do not recall whether I furnished them with a printed formula or not. I had the formulas, but I cannot recall definitely whether I furnished them with the printed formula or not. Q. How did you, then, instruct them in the use of it? A. My instructions were at that time to take 20 pounds of sal-soda and 30 pounds of chlorid of lime, dissolve the chlorid and lime sep-

arately and dissolve the sal-soda in hot water, add the two together, and add a certain quantity of water to make 50 gallons of the mixture, and allow that to settle, draw off the clear solution, and then use vinegar at the proportion of 1 part to 15 of the compound solution. Q. And you fully instructed them in those respects, did you? A. Yes, sir. I stayed there until they commenced to use it successfully and were familiar with the process."

And the inventor Farrell, being questioned in his deposition concerning his experiments before making application for a patent answered:

"A. Well, I used different proportions. I didn't bring it down to— Well, I did bring it down to regular proportions, but according to the nuts. Sometimes I would put in more of one chemical than another. If they were very dirty, I put more chlorid of lime in order to make it stronger. Q. Now, after you got down this formula to the position that you had stated, did you continue to use it on your nuts then? A. Yes, sir. Q. With what success? A. Very good success. Q. How did it compare with the old process in success? A. Well, I considered it a great deal better than the old process."

It is manifest that, if the proportions of chlorid of lime and sal-soda to be used in the process in question was an essential element of the invention, the patent could not be sustained, for the reason that, in such event, the patent does not impart the requisite statutory information to those entitled to avoid or use it. In re Incandescent Lamp Patent, 159 U. S. 465, 474, 16 Sup. Ct. 75, 40 L. Ed. 221; Howard v. Detroit Stove Works, 150 U. S. 164, 14 Sup. Ct. 68, 37 L. Ed. 1039; Wood v. Underhill, 5 How. 1, 12 L. Ed. 23; Tyler v. Boston, 7 Wall. 327, 19 L. Ed. 93; Mitchell v. Tilghman, 19 Wall. 287, 22 L. Ed. 125; Chemical Rubber Co. v. Raymond Rubber Co. (C. C.) 68 Fed. 570; Badische Anilin & Soda Fabrik v. Kalle (C. C.) 94 Fed. 163; Matheson v. Campbell, 78 Fed. 914, 24 C. C. A. 384; Panzl v. Battle Island Paper Co., 138 Fed. 48, 70 C. C. A. 474.

The proceedings in the Patent Office as disclosed by the file wrapper, which appears in evidence, show that Farrell never claimed any specific proportions of chlorid of lime or of sal-soda, or the use of hot water in the process, and that, while he first claimed, in answer to the first rejection of his application by the examiner, his invention to be "the solution prepared in the first instance" by mixing "a solution of chlorid of lime and a solution of sal-soda after they have been separately dissolved, and then keeping this solution as a stock which is drawn upon whenever a lot of nuts are to be bleached," he subsequently based his claim to invention in the matter to the addition to this mixture of a weak acid, and a simultaneous immersion of the nuts while the chlorin gas thus liberated was in a nascent condition. This plainly appears from the voluminous proceedings embodied in the file wrapper.

The examiner, as well as the board of chief examiners of the Patent Office, held that there was nothing new in Farrell's process, and, accordingly, denied the application for a patent, but an appeal to the Commissioner resulted in this decision by the Assistant Commissioner:

"It is well known, as shown by the references, that a mixture of bleaching powder and washing soda has bleaching properties, and that it has been used for bleaching cloth. The appellant does not dispute this, but he correctly contends that his process does not involve merely the application of this well-known scientific fact. He not only applies this mixture to bleaching nuts, but he plunges the nuts into it at the very moment when he adds weak acid thereto, so that the nuts will be subjected to the action of the nascent chlorin lib-

erated. It is true that he is not the discoverer of the fact that chlorin has greater bleaching properties at the moment that it is liberated; but in so far as the record shows, he is the first to conceive the possibility of utilizing the scientific facts for the bleaching of nuts in the manner set forth. He has discovered no new law of nature, but has discovered a new process of utilizing well-known laws in the production of a new and useful result. This, in my opinion, amounts to invention, and entitles him to the protection of a patent.

"The commercial superiority and advantages of the appellant's process over those previously used are shown by certain affidavits filed. These affidavits, when taken with the fact that no one has heretofore used the process set forth for the purpose, notwithstanding a knowledge of the scientific facts upon which it is based, would be sufficient upon which to resolve any doubts as to patentability in the appellant's favor, if any such doubts existed.

"The decision of the examiners in chief is reversed."

It is perfectly plain from the various contentions made on behalf of Farrell in the Patent Office that what he there finally contended was new in his process was the addition of a weak acid to a mixture of the solution of the chlorid of lime and of sal-soda, and the coincident plunging of the nuts therein, thereby obtaining the benefit of the liberated chlorin gas in its nascent condition, and the immediate removal of the nuts from the bath; and also claimed as new the application of the process to nuts. And it was only the plunging of the nuts into the theretofore well-known mixture of bleaching powder and washing soda, "at the very moment when he adds weak acid thereto, so that the nuts will be subjected to the action of the nascent chlorin liberated," that the Commissioner—reversing the adverse ruling of the examiner and chief examiners—held that Farrell had "discovered a new process of utilizing well-known laws in the production of a new and useful result," and was therefore entitled to the patent, which was thereupon issued. The application of an old process to analogous matter, producing a result substantially similar in its nature, is entirely lacking in invention. De Lamar v. De Lamar Min. Co., 117 Fed. 246, 247, 54 C. C. A. 272, and authorities there cited. The new feature in the appellee's process, namely, the plunging of the nuts into the mixture of the solution of chlorid of lime and of sal-soda coincidently with the addition of a weak acid, thereby securing the action of the chlorin gas in its nascent condition, is embraced by claim 1 of the patent, which reads as follows:

"(1) In the art of cleansing and bleaching nuts, the steps consisting in mixing a compound solution of chlorid of lime and sal-soda in a dipping vessel, adding a weak acid thereto, and immediately plunging the nuts into the solution, and removing them, and finally washing them."

But this new and, as held by the Commissioner, patentable feature is not embraced by claim 2 of the patent, which reads as follows:

"(2) In the art of washing and bleaching nuts, the steps, consisting in mixing a compound solution of chlorid of lime and sal-soda in a dipping vessel, adding a weak acid thereto whereby potentially effective chlorin is liberated, and plunging the nuts in an openwork basket into the solution, and immediately removing them."

This is, in effect, admitted by the learned counsel for the appellee, where he says, on page 183 of his brief:

"The next point made by appellant's counsel is in reference to the coincident immersion of the nuts, and is thus expressed by him at page 99 of the brief:

" 'Coincident immersion of the nuts, with the addition of the acid, was an essential and important element in the patentee's claims, and this step was not followed in the use of the process by the defendant, and therefore there was no infringement.'

"The first answer we make to this contention is that claim 2 does not mention such coincident addition of the acid and immersion of the nuts. It simply says: 'Adding a weak acid thereto whereby potentially effective chlorin is liberated, and plunging the nuts in an openwork basket into the solution, and immediately removing them.'

"There can be no doubt as to this language. It does not require that the acid should be added coincidently with the immersion of the nuts. Hence, if we are to be guided by the language of the claim alone, counsel's argument goes for naught, because the language of the claim does not provide for the feature of coincidence.

"This fact is made more apparent by reference to claim 1, which uses the expression, 'adding a weak acid thereto and immediately plunging the nuts in the solution.' It may be that in claim 1 the patentee has limited himself to a coincident immersion of the nuts by using the word 'immediately.' If so, it must follow that the absence of such a word in claim 2 indicates an intention to dispense with that feature in claim 2."

But claim 2 is the only claim of the patent in suit adjudged by the court below to have been infringed, and as it obviously does not cover the only novel feature in the patented process, namely, the plunging of the nuts into the mixture of the solution of chlorid of lime and salsoda coincidently with the addition of a weak acid, and which coincident immersion the evidence shows that the appellant has not practiced, I see no escape from the conclusion that the adjudged infringement cannot be sustained.

Another consideration necessarily leads, in my opinion, to the same conclusion. The acid covered by the patent in suit is "a weak acid." The evidence shows without conflict that at no time during the alleged infringement did the appellant use in its operations any other acid than a diluted sulphuric acid. In one of his opinions the examiner said that "a weak acid is any dilute acid." "This," says the appellant's counsel in his brief, "ought to be conclusive, for it shows what the government intended to grant, and actually did grant, when using the term 'a weak acid.'" But the examiner also said, and so held in each of his opinions, that there was nothing new or patentable in the Farrell process. His statement is as conclusive in the one instance as in the other, but, in reality, is conclusive in neither. Upon the question as to what is "a weak acid," the respective parties introduced the testimony of expert chemists. Professors Hilgard and Dunn, of the Agricultural Department of the University of California, testified on behalf of the appellant, and Professor Price on behalf of the appellee.

Prof. Hilgard testified, among other things, as follows:

"Q. I will ask you to define a weak acid? A. The weakness of acid is only relative. We can make a series of acids at the heads of which would stand sulphuric acid as the strongest, and carbonic acid as the weakest, and between that the different acids would stand in succession. By itself, it is not possible to define a weak acid, but only in comparison with others. Q. You place sulphuric acid. the strongest of any? A. Yes, sir. Q. How does acetic acid rank with respect to strength? A. Acetic acid ranks as rather a weak acid. Q. What is the effect of diluting a strong acid? A. It still remains a strong acid. The rapidity of its action is diminished by

the dilution, but the ultimate result will be the same.    Q. Comparing the effect of dilute sulphuric acid with a weak acid in the solution which is referred to in this Farrell patent, state what the comparison is.    A. The difference would be this:    that while acetic acid as a weak acid is constantly regenerated by its expulsion from the combination with lime by the hydrochloric acid form in the bleaching process, that is not the case with sulphuric. Sulphuric holds its own, will remain in combination, and hydro-chloric acid will really be the free acid acting beyond the first addition of. sulphuric acid. Q. Are you able to state the effect of these two acids upon the liquid solution with respect to length of efficiency?    In other words, which is the more enduring in the solution as an active and continuing agent?    A. The quantity of sulphuric acid added, if sufficient to decompose the entire amount of the bleaching compound, will be most rapid.    The action of the acetic acid will be more lasting.    Q. That is, the addition of the acetic would render the liquid compound effective for a longer time than the sulphuric acid?    A. It would be effective for a longer time:    yes, sir.    The liquid charged with sulphuric acid would lose its efficiency sooner than that charged with acetic. Q. At the time you issued your circular, you knew, of course, the effect that sulphuric acid would have upon the liberation of the gas?   A. Yes, sir.    Q. You did not recommend that?    A. I did not recommend it, because I always feared to put sulphuric acid into the hands of farmers, and my experience seemed to show that a sufficiently short time would suffice to bring the bleaching result about; but American farmers proved to be more impatient than I had anticipated, and they desired to take hold of a quicker method. Q. Why did you fear placing the sulphuric acid in the hands of a farmer? A. It is a very corrosive acid, and constantly gives rise to injuries to the clothes and also to the body.    Q. That is not the case with acetic acid? A. No, that is not the case with acetic.    Q. And in that respect acetic is much safer?    A. It is safer, yes, being vinegar.    Q. Is there any difference in the effect upon the surface of the nut between the sulphuric acid added to the liquid solution referred to and acetic acid, with respect to deposits on the surface?    A. Sulphuric acid, if added in excess, would, in drying, blacken the nuts.    Acetic acid will, on the contrary, evaporate without any effect. Q. Would there be any lime deposit left after a simple dip of the nuts into liquid to which sulphuric acid had been added?    A. There would not; there is no lime in the solution.    Q. Would there be any kind of a deposit left on the surface which would not—    A. (interrupting). There would be no deposit on the surface of the nuts in either case.    It would only be the case if bleaching powder solutions were used."

Prof. Dunn, testified, among other things, as follows:

"Q. I will ask you if there is any classification of acids in the textbooks, or the use of the term among chemists?    A. Yes, acids are classified. Q. In what way?    A. They are classified as strong and weak acids.    Q. What are the strong acids?    A. The strong acids are the mineral acids. They vary in strength, starting with an acid that has the strongest avidity or strength, as we may call it, and grading through to weaker acids.    Q. Well, now, enumerate the strongest acids in the order of their strength.    A. Nitric and hydro-chloric acid stand equally as regards avidity.    They are classed as the same.    Sulphuric acid comes lower in the order.    And the various other mineral acids range from that down.    The organic acids are arranged also in the order of their strength, most of them being, though, weaker acids than the mineral acids.    Q. Will you classify, comparatively, compared with other acids, strong acids?    Where does sulphuric acid rank? A. Sulphuric acid ranks about—    Well, I would—    I could not state just where it ranks.    Probably third or fourth.    Q. Are there other strong acids still weaker than that?    A. There are; yes.    Q. What are they?    A. We have hydro-bromic acid, hydriodic acid;    such acids as those.    Q. Is sulphuric acid a mineral acid?    A. It is a mineral acid.    Q. What kind of acid is acetic acid?    A. Acetic acid is an organic acid.    Q. What do you mean by that?    A. By that we mean that it is an acid belonging to the carbon series of compounds, that are known as organic acids.    Q. Is acetic acid a weak or strong acid in this classification?    A. It is a weak acid.    Q. What is a dilute

acid? A. A dilute acid is a concentrated acid to which some solvent has been added. The solvent usually added to dilute the acids is water. Q. Now, does the dilution of the acid change its rank or definition as being weak or strong? A. It does not. Q. A strong acid dilute is still called a strong acid? A. A strong acid. Q. And it is not properly termed a weak acid even though greatly diluted? A. It is not. Q. Have you any authorities on that subject to which you can refer? A. I believe I have. I will refer to Newell's Chemistry, p. 41. Q. What book is that, and what rank has it? A. It is a text-book used in colleges and schools as a text-book on chemistry. Q. Yes, sir. How long have you known that book to have been in circulation? A. Three years."

Prof. Price testified, among other things, as follows:

"Q. You have classified the acids in this way: You call acetic acid a weak acid? A. Yes, sir, it is weak in certain respects. Q. And you call sulphuric acid diluted a weak acid? A. Either diluted or weak. I am speaking now of the familiar way in which these acids are spoken of in the laboratory. Q. That is, a strong acid diluted is spoken of in the laboratory as a weak acid? A. Yes, sir. I may say, 'Give me the weak hydro-chloric acid.' That would mean immediately that it had been diluted. Q. Is it not a fact that acids are classed as strong or weak, depending upon the activity of the given acid towards bases? A. No, I do not consider it so, and I will tell you why: If I am going to make acetate of soda, it will take 32 parts of strong acetic acid. Now, of course, I am speaking of what you call glacic acid, and the two combined with the same quantity of soda, it would take 49 of sulphuric acid; one to form sulphate of soda, and the other to form acetate of soda. The term in which I understand all acids to be of various degrees of strength is this: that sulphuric acid will drive all other acids out of their combinations; they will combine according to their equivalents. For instance, after having prepared acetate of soda, I add upon that sulphuric acid; it will drive off the acetic acid. That is the sense in which sulphuric acid is stronger than acetic acid. In its affinities for combination, no. Q. Is it not a fact that works upon chemistry do class the acids as strong or weak with respect to their activity toward bases? A. I do not remember having read anything of the kind, because I have given you an illustration that it takes equivalent of acetic acid to combine with soda to form acetate of soda. That equivalent of acetic acid is 32. It will take 49 parts of sulphuric acid to combine with the same quantity of soda. In that respect, as far as the combination with base is concerned, you cannot measure anything by strength, but the strength comes by an acid that will drive the weaker acids, like carbonic acid and acetic acid, from the combinations. That is the sense in which acid is called weak or strong. Q. Acids, according to your definition, are weak or strong with respect to their effect upon each other in combination? A. Their effect upon each other; yes, sir. Sulphuric acid will drive all the other acids away with the exception of all the organic acids. Its effect upon many of the organic acids is to break them up into carbon, carbonic oxide, and carbonic acid. Q. Being placed in a condition of opposition to each other in any given combination, is it not a fact that the sulphuric acid is the strongest of all in the expulsion or elimination of the other? A. Yes, sir, sulphuric acid is stronger in expelling other acids from the combination. Q. Is it not the strongest of all? A. It is the strongest of all in that respect, but not in the respect— For instance, sulphuric acid has no effect upon platinum, and a mixture of nitric and hydro-chloric acid will dissolve it. There are many other substances besides nitric and hydro-chloric acid which will do the same thing, and which sulphuric acid will not do."

The proper conclusion to be drawn from all of this, and from the balance of the testimony of these witnesses is, I think, that the expression "a weak acid" is an ambiguous term. And this conclusion is confirmed by Newell's Chemistry, shown to be a standard work, where that author, at page 41, says:

"A solution which contains a small proportion of solute is called a dilute solution; one containing a large proportion is called a concentrated solution. Thus, dilute sulphuric acid usually contains one volume of acid to three or more volumes of water, while concentrated sulphuric acid is nearly 98 per cent. acid. Sometimes the terms weak and strong replace dilute and concentrated. but they are ambiguous, and their use should be avoided."

The same seems to be indicated in Watt's Dictionary of Chemistry, vol. 1, p. 51, where is given a table showing the relative avidity of the acids with respect to the base soda, and in that table hydro-chloric and nitric acid are classified as having a greater avidity for soda, and there follow in succession hydro-bromic, hydriodic, sulphuric, selenic, formic, phosphoric, acetic, hydro-fluoric, boric, and hydro-cyanic. Reference should therefore be made to the specifications of the patent, and the proceedings in the Patent Office on the application for it, to discover just what the patentee meant by the "weak acid" of the claims. See Hailes v. Albany Stove Co., 123 U. S. 582, 8 Sup. Ct. 262, 31 L. Ed. 284; Royer v. Coupe, 146 U. S. 524, 13 Sup. Ct. 166, 36 L. Ed. 1073; Hubble v. U. S.. 179 U. S. 77, 21 Sup. Ct. 24, 45 L. Ed. 95; Stillwell, etc., Co. v. Cotton, 117 Fed. 410, 54 C. C. A. 584; Jewel Filter Co. v. Jackson, 140 Fed. 340-344, 72 C. C. A. 304. In his specifications, Farrell, in explaining the advantages of his own process and the addition of acid to the mixture of the solutions of chlorid of lime and of sal-soda in order to liberate the chlorin gas, expressly condemned the action of sulphur fumes and sulphuric acid in the old processes therein described, and said:

"I have found that, while many acids might produce the result of liberating the gas. a safe acid for the purpose is acetic acid or vinegar, and of which 1 may use approximately 1 part to 20 of the solution."

And he proceeded to claim only "a weak acid." And, throughout the proceedings in the Patent Office, Farrell, by his attorney, was persistent in his disclaimer of sulphuric acid in order to distinguish his process from the previous processes and references, and particularly from the Ironmonger patent. Furthermore, Farrell himself testified on the trial, among other things, as follows:

"Q. Now, when you finally came down to the process which you use to-day, and for which you took out your patent, what was the result of your experiments with regard to the use of different acids? A. Well, all the acids seem to work good. Q. Did you try the different acids? A. Yes, sir, I tried different acids. Q. What acids did you try? A. I tried sulphuric and muriatic. Q. What results did muriatic and sulphuric acids have? A. Well, they had good results on the color of the nut. Q. How did you come to try vinegar? A. Well, I thought it was more of an article of table use, and I thought it would be more acceptable to the people. Q. The vinegar brings about the same results. does it, as the other does? A. Yes sir, about the same results. Q. What proportion did you use? A. Well, I used different proportions. I didn't bring it down to— Well. I did bring it down to regular proportions, but according to the nuts. Sometimes I would put in more of one chemical than another. If they were very dirty, I put more chlorid of lime in, in order to make it stronger. Q. Now, after you got down this formula to the position that you had stated, did you continue to use it on your nuts then? A. Yes, sir. Q. With what success? A. Very good success. Q. How did it compare with the old process in success? A. Well. I considered it a great deal better than the old process. Q. It was after that, then, that you applied for your patent? A. Yes, sir. Q. What did

you mean by saying you thought vinegar would be more acceptable to the public than muriatic or sulphuric acid? A. On account of those acids being supposed to be more or less poisonous. Q. Kind of prejudice in the minds of the public against their use? A. Kind of prejudice in the mind of the public. Q. But you demonstrated by your experiments that all of those acids were equally good? A. Yes, sir."

And on cross-examination this witness testified, among other things, as follows:

"Q. You say that you used sulphuric acid, muriatic acid, and nitric acid? A. Yes. Q. When did you first use those acids? A. I used them in the first experiments that I made. Q. How did you use them? Explain the method by which you used them? A. Oh, I used them on a small scale in a dip. Just manufactured small quantities and used them in a small scale; just on a few nuts. Q. Well, did you use the sulphuric acid before you used the vinegar, or afterwards? Which was your first use? A. I used the sulphuric acid and the muriatic acid before I used the vinegar. Q. And those you discarded as not being suitable for use because of the public prejudice against them? A. I didn't know but what there might be a public prejudice against the use of the nuts afterwards. Q. Well, you supposed as a matter of fact, did you not, that the sulphuric acid would be hurtful to the nuts, and did you not so state? A. I didn't know whether it would or not. Q. Didn't you so state in your application for— A. Yes, I supposed it probably might. Q. Did you not use this language: 'Various devices have been employed for bleaching or cleansing the nuts. One has been by sprinkling or wetting the ..., and then placing them in a closed room and applying the fumes of sulphur. In some cases the nuts have been rolled in sawdust which is impregnated with a solution of sulphureous acid. The objections to those methods are that the action upon the nuts is not uniform; that any of the nuts which happened to be slightly open become impregnated with the sulphuric acid; and, further, the nuts subjected to this treatment are apt to become rancid within two or three months, and will not keep properly.' You used that language, did you not, in your application for a patent? A. Yes. Q. Well, what did you mean by this statement that 'Any of the nuts which happened to be slightly open would become impregnated with sulphuric acid; and, further, the nuts subjected to this treatment are apt to become rancid in two or three months and will not keep properly?' What did you mean by that? A. Well, I meant that they probably would become rancid from the effects of the sulphuric—from the effects of the sulphur fumes. Q. Did you ever become familiar at any time during your experiments, or while your application for patent was pending, with the patent of Ironmonger? A. I didn't hear you, please. (Question repeated.) A. I did not. Q. Were you present in Washington City while these applications were pending and being contested in the department? A. How is that? (Question repeated.) A. I was not. Q. Do you know whether or not in those applications the process of using sulphuric acid in connection with the bleaching powders was disclaimed and condemned as being injurious to the fruit? A. Using the acid? (Question repeated.) A. I do not. Q. Was your statement as to the effects of sulphuric acid based upon experiment or conjecture? A. Upon experiment. Q. Yes? Then you had discovered, you had so far experimented with the sulphuric acid as to discover, that 'nuts which happened to be slightly open become impregnated with sulphuric acid'? A. Yes, sir. Q. And that they are 'apt to become rancid within two or three months, and will not keep properly'? A. Yes, sir. Q. You made that discovery? A. Yes, sir. Q. From actual experiments? A. Yes, sir. Q. And that, perhaps, is the reason why you made that statement in the application for the patent? A. Yes. Q. And you did not at that time claim in your application for patent that the sulphuric acid was a good agent to use in connection with your bleaching powders? A. I don't remember whether I did or not."

The rule is that a patent should never be construed to include a feature which it is plain the patentee intended to avoid. Magic Light

Co. v. Economy Gas Lamp Co., 97 Fed. 87, 38 C. C. A. 56; Enterprise Mfg. Co. v. Snow (C. C.) 72 Fed. 262; Cotter v. New Haven Copper Co. (C. C.) 13 Fed. 234; Williams v. Goodyear Metallic Rubber Co. (C. C.) 49 Fed. 245; Id., 54 Fed. 498, 4 C. C. A. 485.

It seems to me quite clear from what has been said that the "weak acid" claimed by the patentee did not include sulphuric acid in any form. And, if it did, the claims were not sufficiently specific, for, as said by Judge Dallas in the somewhat analogous case of Chemical Rubber Co. v. Raymond (C. C.) 68 Fed. 570, 572:

"The claims themselves neither indicate what strength of acid is sufficient, nor define what is meant by strong acid. Upon this most material point they supply no information whatever."

And, in affirming the judgment of Judge Dallas in that case, the Circuit Court of Appeals for the Third Circuit said, in 71 Fed. 182, 18 C. C. A. 31, that if the invention—

"really involves the use of diluted acid, and dilution with water is requisite to the operation, it was his (the inventor's) duty to describe the solution, or state the practical rule which accomplishes the desired result."

I think the case of Chemical Rubber Co. v. Raymond very much in point, and that it supports the conclusion to which I have come.

In my opinion the judgment should be reversed, with directions to the court below to dismiss the complainant's bill.